**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2433

_____

| | | |
|---|---|---|
| Bremen Bank and Trust Company, | * | |
| | * | |
| Plaintiff - Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Missouri. |
| | * | |
| United States of America, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: January 16, 1997

Filed: December 19, 1997

_____

Before WOLLMAN, FLOYD R. GIBSON, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

This is a lien priority dispute between a perfected security interest held by Bremen Bank and Trust Company (the Bank) and a federal tax lien. The Bank filed

this action, seeking the return of funds levied and collected by the Internal Revenue Service (IRS) pursuant to a federal tax lien against Ingredient Transportation Company (Ingredient). The Bank claims the IRS's levies against Ingredient's contractual customers were wrongful because the tax lien was junior to the Bank's prior perfected security interest in the proceeds of Ingredient's contract rights. In addition, the Bank claims the IRS wrongfully levied money in Ingredient's checking account at the Bank, because that money was subject to the Bank's automatic right of setoff under Missouri law. The district court rejected the Bank's claims and granted summary judgment to the government. We affirm in part and reverse and remand in part.

## I.

Ingredient, the debtor-taxpayer in this case, was a trucking company that transported general commodities. Ingredient had entered into written contracts with three of its customers. These contracts contained terms concerning shipping, risk of loss, price, and payment. In all three contracts, the price of shipping was to be determined by Ingredient's attached schedule of rates, subject to reasonable adjustments for Ingredient's increased costs, and payment was due upon the completion of Ingredient's performance. Two of the contracts were minimum requirements contracts under which Ingredient's customers, Interstate Brands Corp. and Mederer Corp., were required to tender to Ingredient a minimum quantity of goods to be shipped during the contract period. These contracts were effective for a term of one year and were automatically renewed after that from year to year, subject to a termination by either party upon 30 days' prior notice. The third shipping contract was a three-year, exclusive rights agreement, under which the customer, Cargill, Inc., promised Ingredient the exclusive right to transport all of the bulk flour produced at one of Cargill's flour mills. Ingredient entered into all three of these agreements prior to July 6, 1993.

2

Ingredient had loan obligations to the Bank based upon several transactions. In September 1991, the Bank loaned Ingredient $30,000, represented by a promissory note. The Bank also loaned over $600,000 to American Lease Technology, Inc. (ALT), a Missouri Corporation related to Ingredient, in the fall of 1992. Soon thereafter, the Bank extended another loan to ALT for $12,027. Ingredient signed guarantees on the loans to ALT.

The Bank and Ingredient entered into security agreements on Ingredient's obligations to the Bank, including both Ingredient's direct obligation on the 1991 loan and the obligations under Ingredient's guarantee on the loans to ALT. The security agreements listed as pledged collateral Ingredient's accounts, contract rights, and other rights to payment. The Bank perfected the security agreements by properly filing financing statements on September 23, 1991; June 8, 1992; and June 10, 1992. All three financing statements give notice of the Bank's security interest in ?all present and future accounts receivable, proceeds arising therefrom, chattel paper, contract rights, and general intangibles, however evidenced or acquired." (Appellant's App. at 19, 20, 28.) Thus, the Bank had a properly perfected security interest in Ingredient's contract rights and the proceeds arising therefrom, as well as Ingredient's present and future accounts receivable.

On July 6, 1993, the Internal Revenue Service (IRS) filed notice of a federal tax lien against Ingredient for unpaid federal employment taxes for the fourth quarter of 1992. In March 1994, IRS served notices of levy on the Bank, with whom Ingredient maintained a checking account, and on Ingredient's customers, including the three contractual customers discussed above. The levies required the Bank and the customers to turn over any property owned by or owed to Ingredient. On May 2, 1994, the IRS filed a second notice of federal tax lien for unpaid employment taxes for the tax periods after 1992, and proceeded to make additional levies. The IRS allocated the funds it obtained from the various levied sources either to the July 1993 lien or to the May 1994 lien. (See chart, Appellant's Br. at 10.)

3

The IRS collected $180,762 from all of its levies. Most of the money collected -- including $89,450 from Interstate Brands Corp., $9,865 from Mederer Corp., and $6,374 from Cargill, Inc. -- was collected from invoices for services rendered by Ingredient and billed more than 45 days after the filing of the July 6, 1993, tax lien. A sum of $31,630.08, representing money Ingredient had actually received for services rendered and billed during that same period of time, was on deposit in Ingredient's checking account at the Bank when it was levied upon. The Bank surrendered the money in the account under protest.

The IRS eventually returned $100,696 out of the $180,762 to the Bank, because the Bank had a superior right under its perfected security interest to the levy proceeds which the IRS had allocated to the May 1994 tax lien. The IRS retained $80,067 pursuant to the July 1993 lien in satisfaction of Ingredient's outstanding employment tax balance for the fourth quarter of 1992. The Bank requested return of the $31,630.08 from Ingredient's checking account, which had been levied upon pursuant to the July 1993 lien. The Bank contended that Ingredient had no property rights in the checking account because of the Bank's automatic right of setoff. The IRS refused to return the money, contending that it had returned all but the amount to which it had a superior interest under its July 1993 lien.

The Bank filed suit against the United States for wrongful levy, seeking return of the amounts levied from Ingredient's contractual customers and the amount levied directly from Ingredient's checking account at the Bank. The Bank argued that the amounts collected from Ingredient's contractual customers stemmed from contract rights acquired by Ingredient before the July 1993 tax lien filing. Thus, the Bank argued, its security interest in Ingredient's contract rights, as well as in the identifiable proceeds from those contract rights, i.e., the amounts owed by Ingredient's customers to Ingredient for trucking services rendered, was superior to the government's tax lien. The Bank also argued that the levy against Ingredient's checking account was wrongful. The Bank further contended that the IRS could not justify its retention of

4

money the IRS allocated to the July 1993 lien on the basis that it could have allocated the levies differently and then could have retained the entire amount owed pursuant to the July 1993 tax lien after returning the amount levied pursuant to the May 1994 lien. The Bank also asserted, under Missouri law regarding setoffs, that Ingredient had no cognizable property interest in the checking account funds, because the Bank had an automatic right of setoff upon Ingredient's default on its loan obligations to the Bank.

The district court granted summary judgment to the IRS. The court concluded that amounts due to Ingredient from its customers were accounts receivable, not proceeds of contract rights. Categorized as such, the collateral was subject to levy by the IRS. The district court further held that the dispute over the $31,630 in Ingredient's checking account was moot, because other valid levies independently generated enough money to satisfy Ingredient's $80,067 tax liability on the July 1993 lien. The Bank appeals.

## II.

An innocent third party whose property has been confiscated by the IRS to satisfy another party's tax liability may sue for wrongful levy. See 26 U.S.C. § 7426(a)(1) (1994). To prevail, the third party must establish that there was an actual levy on the property, that the party has an interest or lien superior to the United States' interest in the property, and that the levy was wrongful. Id.

The Internal Revenue Code provides for a federal tax lien in favor of the government against any person who fails to pay federal taxes. 26 U.S.C. § 6321. This lien attaches to "all property and rights to property, whether real or personal, belonging to such person." Id. The tax lien arises automatically at the time of the IRS's assessment and continues until the liability is satisfied or becomes unenforceable due to a lapse of time. Id. § 6322. To be effective as against third parties, notice of the lien must be publicly filed pursuant to state recordation law.

5

When addressing disputes involving federal tax liens, the Supreme Court has held that the questions of whether a property interest exists and the precise nature of that interest are state-law issues, but the question of priority between conflicting interests is governed by federal law. See, e.g., Aquilino v. United States 363 U.S. 509, 513-14 (1960).  Before 1966,  the Internal Revenue Code itself did not specify any rules for priority contests between federal tax liens and state-created liens.  United States v. Kimbell Foods, Inc., 440 U.S. 715, 720 n.6 (1979).  Therefore, the Supreme Court applied the common-law ?principles that first in time is first in right and that tax liens are superior to inchoate liens." State Bank of Fraser v. United States, 861 F.2d 954, 963 (6th Cir. 1988) (citing United States v. City of New Britain, 347 U.S. 81, 85-86 (1954)).  A lien was inchoate unless the amount of the lien, the identity of the lienor, and the property subject to the lien were specific and certain.  City of New Britain, 347 U.S. at 86.

In 1966, Congress enacted the Federal Tax Lien Act of 1966, which ?modified the Federal Government's preferred position under the choateness and first-in-time doctrines, and recognized the priority of many state claims over federal tax liens." Kimbell Foods, Inc., 440 U.S. at 738.  In enacting this legislation, ?Congress sought to 'improv[e] the status of private secured creditors' and prevent impairment of commercial financing transactions by 'moderniz[ing] . . . the relationship of Federal tax liens to the interest of other creditors.'" Id. (alterations in original) (quoting S. Rep. No. 1708, 89th Cong., 2d Sess., 1-2 (1966), and citing H.R. Rep. No. 1884, 89th Cong., 2d Sess., 35 (1966)).  Thus, although the choateness and first-in-time doctrines survive, they have been legislatively altered to some degree.

One of the provisions in the Federal Tax Lien Act that partially displaced these doctrines is codified at 26 U.S.C. § 6323(c).  As pertinent here, section 6323(c) protects certain ?commercial transactions financing agreements" with a 45-day safe-harbor period.  Under this provision, a federal tax lien is invalid against a security

interest[1] arising within 45 days after the tax lien is publicly filed if the collateral covered by the security interest is "qualified property" covered by a written "commercial transactions financing agreement" executed prior to the tax filing. "Qualified property" is "commercial financing security" (including, inter alia, accounts receivable and contract rights) acquired by the taxpayer within 45 days after the tax lien filing. Id. §§ 6323(c)(2)(B), 6323(c)(2)(C)(i) & (ii); 26 C.F.R. § 301.6323(c)-1(c) (1997). A "commercial transaction financing agreement" is, as relevant here, a security agreement between a commercial lender and the debtor where the lender has advanced the money to the debtor prior to the expiration of 45 days after the tax lien filing and without actual notice of the tax lien. See 26 U.S.C. § 6323 (c)(2)(A); 26 C.F.R. 301.6323(c)-1(b). Thus, pursuant to section 6323(c), the Bank's security interest in Ingredient's collateral is superior to the government's tax lien if (1) the security agreements were entered into prior to the tax lien filing; (2) the loans to Ingredient were extended prior to the tax lien or within 45 days afterwards, without the Bank's actual knowledge of the tax lien; and (3) Ingredient acquired the collateral within 45 days after the tax lien filing. The district court concluded that the Bank had failed to meet this standard.

We review the district court's grant of summary judgment de novo. Madel v. FCI Mktg., Inc., 116 F.3d 1247, 1251 (8th Cir. 1997). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

---

[1]For purposes of § 6323, a "security interest" is actually what is more commonly understood as a perfected security interest. See 26 U.S.C. § 6323(h)(1) (defining an existing security interest as "any interest in property acquired by contract for the purpose of securing payment or performance of an obligation" for which the collateral is in existence, the secured party "has parted with money or money's worth," and "the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation").

7

A.  The Amounts Due to Ingredient from Contractual Customers

Of the three showings the Bank must make to prove that it had a superior interest in the money levied by the IRS, only the third point is at issue with regard to the money collected from Ingredient's contractual customers.  The Bank indisputably entered into and perfected its security interest prior to the tax lien filing, and it loaned its money to Ingredient long before the 45-day safe harbor period expired, all without any knowledge of the tax lien.  The fighting issue is whether Ingredient acquired rights in the collateral within 45 days after the tax lien was filed.

The determination of when a debtor acquires its collateral is related to how the collateral is defined.  For example, a contract right, which is "any right to payment under a contract not yet earned by performance and not evidenced in an instrument or chattel paper," 26 C.F.R. § 301.6323(c)-1(c)(2)(i), is acquired by a taxpayer "when the contract is made," id. § 301.6323(c)-1(d).  An account receivable, however, which is "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper," id. § 301.6323(c)-1(c)(2)(ii), is not acquired until "the time, and to the extent, a right to payment is earned by performance," id. § 301.6323(c)-1(d).

The difficulty in categorizing the collateral in this case arises because accounts receivable can also be the proceeds of contract rights.  See State Bank of Fraser, 861 F.2d 965; In re National Fin. Alternatives, Inc., 96 B.R. 844, 853 (Bankr. N.D. Ill. 1989).  If the accounts receivable in this case are identifiable proceeds of contract rights in which the Bank had a continuously perfected security interest, the accounts receivable (as proceeds) are deemed to be acquired for purposes of determining priority when the original contract rights were acquired, i.e., when the contract was made.  26 C.F.R. § 301.6323(c)-1(d).  If so, then the Bank's perfected security interest would be superior to the federal tax lien.  If, however, the accounts receivable cannot be correctly characterized as the proceeds of contract rights, the federal tax lien prevails over the

Bank's security interest. Thus, the determinative question becomes whether Ingredient acquired ?contract rights" under its shipping contracts, such that Ingredient's later generated accounts receivable with its contractual customers were the proceeds of those contract rights.

As an initial matter, we note the parties' agreement that the contracts between Ingredient and its three customers did exist. Further, the IRS concedes that Ingredient had property rights under its contracts. (See Appellee's Br. at 15.) The point of contention is on the narrow question of whether those property rights can be deemed ?contract rights" for purposes of section 301.6323(c)-1(c)(2)(i) of the federal regulations.

The district court found that Ingredient had no contract rights under the minimum quantity agreements with Interstate Brands Corp. and Mederer Corp., because (1) either party could terminate the agreement upon 30 days' written notice to the other, (2) the contracts do not contain particular shipping schedules, and (3) the contracts specify that payment was due as the services were rendered. The court likewise found that Ingredient had no contract rights under the exclusive-rights agreement with Cargill, because (1) the agreement did not provide a minimum amount of product to be shipped, (2) the agreement did not specify a shipping schedule, and (3) the contract specified that payment was due only after shipping services were rendered. Consistent with the IRS's contentions about contract rights, the court concluded that ?Ingredient's rights to payment did not arise until it had actually performed the services, that is, shipped the goods provided by its customers, and it then billed the customers for whatever work was actually performed." (Appellant's App. at 163-64.) By that time, the court concluded, the 45-day safe harbor period had expired.

To the contrary, the Bank argues that Ingredient acquired contract rights pursuant to its contracts with Interstate Brands Corp., Mederer Corp., and Cargill, Inc., and that the Bank's perfected security interest in those contract rights and the proceeds

9

generated from those rights is therefore superior to the government's tax lien. The IRS concedes that the Bank had a prior perfected security interest in Ingredient's contract rights, but defends the district court's conclusion, arguing that the shipping contracts did not give rise to any ?contract rights" as that term is defined in the federal regulations. The IRS contends that ?where a contract gives the taxpayer the right to be paid <u>prior</u> to performing the services, that right to payment is a ‹contract right[,]' [but] where the taxpayer does not have the right to be paid until after the services are performed, the right to payment is a ‹right to payment for . . . services rendered'" and thus is merely an account receivable. (Appellee's Br. at 17 (quoting 26 C.F.R. § 301.6323(c)-1(c)(2)(ii)).)

We disagree with the IRS's characterization of the definition of ?contract rights" in the federal regulations. Section 301.6323(c)-1(c)(2)(i) defines a contract right as ?any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." This language indicates Congress's understanding that in the ordinary commercial context, actual payment under a contract is typically due only when it is earned by some performance, but contract rights may exist prior to that time. Section 301.6323(c)-1(c)(2)(i) explicitly recognizes that such contracts generate ?contract rights" from the outset even though performance has not yet occurred. To hold otherwise would be to exclude most service contracts, thereby frustrating congressional intent to ?improve the status of private secured creditors and prevent impairment of commercial financing transactions by modernizing the relationship of Federal tax liens to the interests of other creditors." <u>Kimbell Foods, Inc.</u>, 440 U.S. at 738 (internal quotations and alterations omitted).

We are unpersuaded by the IRS's heavy reliance on <u>Shawnee State Bank v. United States</u>, 735 F.2d 308 (8th Cir. 1984) (per curiam). <u>Shawnee</u> involved a reimbursement agreement between a state and a nursing home under Title XIX of the Social Security Act. In addressing a separate question, we approved of, and the parties did not dispute, the district court's determination that the nursing home had earned the

relevant accounts receivable from the state ratably, based upon the services rendered to qualified customers, and that the bank had acquired a perfected security interest in those accounts as they accrued. Id. at 310. There was no argument that the accounts receivable were in fact the proceeds of contract rights, and the contracts at issue in the present case are quite different. The contracts at issue here are consensual agreements for services between two private parties and are not dependent on the existence of an account receivable between one of the parties and a third party. As private consensual agreements, they also are not based upon a federal or state reimbursement program. Thus, Shawnee does not control our characterization of the property rights at issue in the present case.

Other cases cited by the IRS are similarly inapposite. See, e.g., Society Nat'l Bank v. United States, 1996 WL 196644 (S.D. Ohio 1996) (unpublished); Gold Coast Leasing Co. v. California Carrots, Inc., 155 Cal. Rptr. 511 (Cal. Ct. App. 1979). The courts in those cases treated the accounts as accounts receivable, but no parties argued that the accounts receivable were also proceeds of contract rights. We conclude, contrary to the contention of the IRS, that a contract need not specifically provide a right to be paid prior to performance in order to generate ?contract rights" pursuant to 26 C.F.R. § 301.6323(c)-1(c)(2)(i).

Our rejection of the IRS's contention is, however, not a complete answer to this dispute. We must determine the circumstances under which a debtor has a ?right to payment under a contract not yet earned by performance," within the meaning of the regulation. Id. Our answer lies in state law. See United States v. Rodgers, 461 U.S. 677, 683 (1983) (noting ?it has long been an axiom of our tax collection scheme that . . . the definition of underlying property interests is left to state law"); Aquilino, 363 U.S. at 513 (noting ?it has long been the rule that in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property") (internal quotations omitted); Hoornstra v. United States, 969 F.2d 530, 532 (7th Cir. 1992) (?[S]tate law governs our inquiry into whether the

11

taxpayer had property or rights to property in the subject sought to be attached."). Thus, we first look to Missouri law to determine whether Ingredient had any right to payment under its contracts. We then must also consider whether those rights, as determined under Missouri law, are sufficiently choate to be recognized under the federal tax code. A contract right to payment upon services rendered is choate, or ?specific and certain," when the parties have promised under a binding agreement to render goods or services in exchange for payment. See Around the World Importing, Inc. v. Mercantile Trust Co., 795 S.W.2d 85, 90 (Mo. Ct. App. 1990) (holding that to be a valid contract, its terms must be certain and specific such that a court could enforce it). Under such an agreement, either party's failure to fulfill its promise would subject that party to suit for breach of contract.

We first consider Ingredient's exclusive-rights contract with Cargill, Inc. Among other things, this contract included terms concerning the responsibilities of the parties, the risk of loss, payment for performance, and termination of the contract. It therefore generated enforceable contract rights under Missouri law. In particular, Ingredient had the right to be the sole shipper of Cargill's goods under the terms of the agreement. Thus, if Cargill hired another shipper, Ingredient would have a cause of action for breach of contract. The agreement did not, however, generate a choate right to payment, for Ingredient had no right to ship any specific amount of Cargill's goods. Because Ingredient's contractual rights with Cargill did not include a choate right to payment, the district court correctly granted summary judgment to the government with regard to this contract.

The two minimum-requirements contracts with Interstate Brands Corp. and Mederer Corp. present an entirely different situation, however. Ingredient acquired a right when the contracts were made to haul a sum certain minimum amount of goods at a predetermined rate. The failure of Interstate Brands or Mederer to meet this minimum would be a breach of contract, and Ingredient would have a right to recover its losses. Thus, up to the minimum requirements, Ingredient had a ?right to payment."

12

At the same time, Ingredient did not have an enforceable right to payment (a contract right) for any hauling beyond the minimum requirements. The accounts generated from the amounts shipped beyond the minimum requirements could not be considered proceeds from contract rights.

Accordingly, the answer regarding who has priority to the accounts from the goods shipped under contracts with Interstate Brands Corp. and with Mederer Corp. depends upon whether the goods were shipped to meet the minimum contract requirements. To the extent the goods Ingredient shipped were within the contract's minimum requirements, the accounts receivable generated by Ingredient's performance were proceeds of contract rights and should be deemed acquired by Ingredient on the date it acquired the contract rights. However, the right to be paid for any shipment of goods in excess of the contracts' minimum requirements were merely accounts receivable, not proceeds of Ingredient's pre-existing contract rights, and therefore were acquired at the time, and to the extent, Ingredient earned payment by performing its services. 26 C.F.R. § 301.6323(c)-1(d). We therefore reverse the district court on this issue and remand for a determination of whether and to what extent the goods Ingredient hauled after the 45-day safe-harbor period had expired were shipped in fulfillment of the minimum requirements provisions in Ingredient's contracts with Interstate Brands Corp. and Mederer Corp.

As a final note regarding the contract-rights issue in this case, we believe the district court placed too much weight on the contractual terms providing for termination on 30 days' notice and on the failure of the contracts to set forth particular shipping schedules. Those terms (or lack thereof) are not controlling, because Ingredient's contract rights as to the minimum requirements are nonetheless sufficiently certain and specific to be enforceable under state law. See Around the World Importing, 795 S.W.2d at 90. This case cannot be compared to In re May Reporting Servs., Inc., because there was no enforceable contract under state law in that case. See 115 B.R. 652, 660 (Bankr. D.S.D. 1990).

B. Ingredient's Checking Account at the Bank

The Bank next argues that the district court erred in finding its claim for the return of the amounts collected from Ingredient's checking account to be moot. The Bank contends the district court erroneously allowed the IRS to reallocate funds levied pursuant to the two federal tax liens. The Bank further argues that the levy was wrongful because Ingredient had no property right in the checking account at the time of the levy. We address these claims in turn.

The IRS collected a total of $180,762.43 from the Bank and the customers of Ingredient pursuant to notices of levy it served on them. All of the sums so collected were for services rendered by Ingredient and billed more than 45 days <u>after</u> the July 6, 1993, filing of the notice of tax lien. That includes the $31,630.08 surrendered by the Bank because the bank account contained receipts received by Ingredient for services rendered and billed more than 45 days after the July 6, 1993, filing of the notice of tax lien. (<u>See</u> App. at 42, Stipulation, para. 35.) The IRS filed a second notice of tax lien on May 2, 1994. However, all amounts collected by the IRS were monies due to Ingredient for its services rendered and billed <u>prior</u> to the expiration of the 45-day safe harbor period following the filing of the second notice of tax lien on May 2, 1994. (<u>See</u> App. at 43, Stipulation, para. 36.) Hence, all of the individual amounts received by the IRS pursuant to the levies were for services rendered after the expiration of the 45-day safe harbor of the July 6, 1993, tax lien, but before the expiration date of the safe harbor period following the filing of the second notice of tax lien on May 2, 1994. (<u>See</u> App. at 42-43, Stipulation, paras. 35 and 36.) As the IRS conceded in the district court, its allocation to the May 2, 1994, tax lien of some $100,695.74 of the total $180,762.43 produced by the various notices of levy was wrongful as to the Bank because that $100,695.74 was applied to tax periods for which the IRS had not yet filed a notice of tax lien, and for the reason that the Bank had a prior security interest in the monies. (<u>See</u> App. at 159, Mem. and Order of the District Ct. at 3.) The IRS returned the $100,695.74 to the Bank. Out of the total $180,762.43, the IRS retained the

remaining $80,066.69 which it used to apply against Ingredient's fourth quarter 1992 employment tax assessment which was still outstanding and which was secured by the July 6, 1993, tax lien. Included in that $80,066.69 was $28,615.21 of the $31,630.08 originally surrendered from Ingredient's checking account by the Bank under protest.

In response to the Bank's claim of its right to the $28,615.21 pursuant to its alleged prior right of setoff, the IRS refused to surrender the funds on the theory that it had reallocated the checking account money to the May 2, 1994, tax lien (which money had already been returned to the Bank) and had replaced it with other available funds allocated to the May 1994 lien. The IRS claimed it was free to reallocate the money and retain up to the properly levied amount ($80,066.69) from any of its levy collections. Citing no cases to support its decision, the district court agreed with the IRS and declared the Bank's setoff claim moot. (App. at 164.) We respectfully disagree. Neither the $28,615.21 the IRS took from the bank account and applied against the July 6, 1993, tax lien nor any substituted funds in that amount have been returned to the Bank. The issue of whether the Bank or the IRS had the priority interest in Ingredient's checking account remains alive.

We disagree with the IRS's assertion that it has unfettered discretion to reallocate funds levied to two or more liens when that allocation works to the detriment of a competing prior lienholder or secured creditor. To allow the government to do so would be to eviscerate the principle of first in time, first in right. See Pollack v. United States, 370 F.2d 79, 81 (2d Cir. 1966) (**?**[I]n the context of a series of government liens, . . . an application of the first in time, first in right rule prevents the government from using the security of a prior lien to satisfy subsequent liens to the detriment of an intervening or competing creditor whose security is superior to that of the government with respect to its junior liens.").

> We would consider it strange indeed if the Congress intended for the
> Courts to be bound by the principle, **?**the first in time is the first in right,"

but intended for the collection officials of the Government to be left free to disregard that principle. We do not attribute any such intent to Congress, and hold that the principle just mentioned is as binding upon the collection officials as it is upon the courts.

Commercial Credit Corp. v. Schwartz, 130 F. Supp. 524, 530 (E.D. Ark. 1955). We hold the IRS cannot reallocate money levied to one of a series of liens in order to defeat the priority of a competing lienholder, and the levy on the checking account funds must remain allocated to the July 1993 lien.

The question then becomes whether the levy was proper. If Ingredient had property rights in the account, the levy was proper, because Ingredient had acquired the money as payment for services rendered after the 45-day post-filing period for the July 1993 tax lien, and the Bank's security interest was not statutorily protected. See 26 U.S.C. § 6323 (c)(2)(A). The Bank argues, however, that Ingredient lost its property interest in the checking account money prior to the tax lien filing, pursuant to the Bank's state law automatic right of setoff.

A bank subject to a federal tax levy regarding one of its customers is not required to surrender property pursuant to the federal tax levy if, at the time of the levy, the taxpayer had no property interest in the levied property. United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985). As we noted in our discussion of the contract rights issue, we look to state law to determine whether a taxpayer has a legal interest in property. See id. A taxpayer has no property rights to which a levy can attach if the applicable state law provides for an automatic right of setoff against mature obligations owed to the Bank at the time of the federal tax levy. See id.

Under Missouri law, the Bank had an automatic right of setoff by operation of law when Ingredient's debt was due and mature. Frierson v. United Farm Agency, Inc., 868 F.2d 302, 303 (8th Cir. 1989); Herd v. Ingle, 713 S.W.2d 887, 890 (Mo. App.

16

1986). "Missouri law considers a debt due when the bank has the <u>power</u> to deem the debt due, not when the bank actually <u>exercises</u> that power." <u>Frierson</u>, 868 F.2d at 304 (citing <u>Herd</u>, 713 S.W.2d at 890). Thus, the Bank's right of setoff did not depend upon its declaration that Ingredient had defaulted on its debt or even upon its actual knowledge of default. <u>Herd</u>, 713 S.W.2d at 890.

Because the district court found the setoff argument to be moot, it did not address whether or not Ingredient was in default to the Bank when the IRS came calling with its notice of levy. While the Bank's brief argues that Ingredient was in default, the record affidavit relied on in support of the argument is conclusory at best, and the facts relied upon by the Bank are disputed and unresolved. (<u>See</u> Appellee's Br. at 3 n.5, 22 n. 7.) We agree that the issue of whether or not Ingredient was in default when the IRS served its levy so that the Bank's state law right of setoff may act to trump the IRS's claim is a matter best addressed by the district court on remand. Without an adequate factual record on this issue, we decline to make the determination in the first instance. On remand, we direct the district court to determine whether Ingredient was in default on its obligations to the Bank at the time of the IRS's levy on the Bank, and if so, whether Missouri's setoff law permits the Bank to avoid the levy.

## III.

For the above reasons, we affirm the district court's judgment as to the amounts collected by the IRS from Cargill, Inc. We reverse the district court's judgment as to the amounts collected from Interstate Brands Corp. and from Mederer Corp., and we remand the case to the district court for further consideration of whether the money levied upon from those two shippers by the IRS was due to Ingredient for services rendered in the fulfillment of the minimum requirements contained in their transportation contracts with Ingredient. We also reverse the district court's mootness holding as to the $28,615.21 in Ingredient's checking account which was surrendered

17

by the Bank under protest, and remand that issue pursuant to the discussion in Part II(B) above.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.