**AMERICAN INVESTMENT FINANCIAL, aka American Investment Bank, N.A., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 2:03–CV–00844 PGC.

United States District Court, D. Utah, Central Division.

April 13, 2005.

Michael R. Johnson, Matthew Mikel Boley, Snell & Wilmer (UT), Salt Lake City, UT, for Plaintiff.

Anita Machhar, U.S. Department of Justice, Tax Division, Washington, DC, Jeannette F. Swent, U.S. Attorney's Office, Salt Lake City, UT, for Defendant.

MEMORANDUM DECISION GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

CASSELL, District Judge.

This priority dispute arises out of an IRS tax lien and a security interest in certain collateral held by American Investment Financial ("AIF"). Both of the IRS and AIF liens extend to payments received by a medical care provider, Nightime Pediatrics ("Nightime") for medical services provided pursuant to agreements Nightime had entered into with various health-care insurance companies (the "Provider Contracts"). The issue before the court is which lien has priority.

As part of its security agreement with AIF, Nightime pledged several types of collateral, including accounts receivable and general intangibles. AIF contends that its interest in Nightime's general intangibles includes any contract rights Nightime acquired when it formed the Provider Contracts. Because insurance companies made payments to Nightime for services it rendered to patients more than 45-days after the filing of the notice of federal tax lien, and because those payment were made pursuant to the Provider Contracts which were entered into well before the notice of tax lien was filed, AIF has brought this claim asserting that it holds priority to those funds.

The court finds that partial summary judgment in favor of the government is appropriate in light of Utah's Uniform Commercial Code's definition of health-care-insurance receivables. That statute categorizes payments like those at issue here as a type of account receivable, which arise at the time a medical service is rendered—not (as AIF claims) at the time an insurance contract is entered into. As a result, the Disputed Cash is subject to the tax lien, save only funds Nightime acquired before the 45-day safe harbor period expired.

## BACKGROUND

AIF is a Utah industrial loan corporation. Nightime is a Utah corporation that

provided after-hours medical care to patients. In 2000, Nightime requested a loan from AIF for approximately $803,000, to be secured by all of Nightime's presently existing and after-acquired accounts, inventory, and general intangibles. Nightime was required to make monthly installment payments to AIF. When it defaulted on its obligation as of November 6, 2002, AIF demanded that Nightime cure its default.

Before it ran into difficulties repaying AIF, however, Nightime had incurred obligations to the Internal Revenue Service. Beginning in 1999, Nightime failed to pay employment taxes, penalties, interest and other statutory additions. On May 14, 2002, the IRS filed the first of four tax liens. As of October 11, 2003, Nightime owed a balance of $599,739.41 on the IRS assessments.

On August 31, 2003, Nightime ceased operations. On closure, Nightime's assets included inventory, accounts receivable, and general intangibles. The accounts receivable consisted of accounts owed to Nightime from various healthcare insurance companies (the Insurance Receivables). The Insurance Receivables were to have been paid pursuant to written contracts entered into between Nightime and such healthcare insurance companies (the Provider Contracts) before the first Notice of Federal Tax Lien filing on May 14, 2002.

As of July 31, 2004, there was at least $315,863.37 in cash receipts from the liquidation of the accounts receivable, and $28,761.92 from the liquidation of Nightime's inventory. A large part of the cash receipts from the liquidation of the accounts receivable is based on services Nightime rendered to patients after June 28, 2002—the end of the 45 day "safe harbor" period after the tax liens were imposed. The Insurance Receivables Nightime received for services provided after June 28, 2002 (receivables based on the Provider Contracts) is the fund that is disputed in this matter (the "Disputed Cash"). AIF makes no claim to accounts receivable paid by persons or entities that did not have a Provider Contract with Nightime, unless the payment was for services Nightime rendered on or before June 28, 2002. Instead, AIF claims that its interest in the Disputed Cash takes priority over the tax lien regardless of the date Nightime provided services because the Disputed Cash stems from the contract rights Nightime acquired through the Provider Contracts.

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] In applying this standard, the court must examine the evidence and reasonable inferences therefrom in the light most favorable to the non-moving party.[2] Because this case involves cross-motions for summary judgment, the court must " 'construe all inferences in favor of the party against whom

---

1. Fed.R.Civ.P. 56(c).

2. *See Gaylor v. Does,* 105 F.3d 572, 574 (10th Cir.1997).

the motion under consideration is made.'"[3]

## DISCUSSION

The issues before the court are (1) whether AIF has a security interest in the Disputed Cash pursuant to the Provider Contracts with Nightime, and (2) if AIF's security interest does extend to these payments, whether AIF"s interest takes priority over the interest of the United States. Because the court finds that the payments due to Nightime based on the Provider Contracts for services rendered after the safe harbor period had ended (June 28, 2002) were proceeds from accounts receivable, the court need not address the first issue.

The Federal Tax Lien Act (FTLA) grants the United States a lien on all property and rights to property belonging to taxpayer if that individual fails to pay taxes after a demand has been made.[4] The FTLA also provides that such tax lien arises automatically upon assessment and attaches to property subsequently acquired by the taxpayer.[5] The Act, however, also gives commercial liens priority over federal tax liens in some situations.[6]

Section 6323 gives commercial lenders priority over the government's lien in certain kinds of property that might otherwise be inchoate—including accounts receivable—but only if the property is ac-

quired by the taxpayer-debtor within 45-days after the tax lien notice is filed. "Before 1966, the requirement of choateness ... generally operated to prevent a nonfederal lien from gaining priority over a federal tax lien with respect to property acquired by the debtor after the tax lien had arisen, even though the nonfederal lien antedated the tax lien."[7] In an effort to mitigate the traditional doctrine of choateness, under which security interests would be inchoate either if the loan had not been disbursed or if the collateral had not come into existence by the time the tax lien was noticed, a 45-day safe harbor period was added to the tax code. The underlying purpose of the statute as relevant to this case is straightforward: protection is given the financier "only where the loan or purchase is made not later than 45-days after the tax lien filing ... and only where the inventory, accounts receivable, etc., are acquired before the 45-days have elapsed."[8]

"To fall within § 6323(c)'s safe harbor for after-acquired property, a security interest must be in 'qualified property covered by the terms of a written agreement entered into before tax lien filing,' including 'commercial transactions financing agreements.'"[9] As relevant here, a CTFA is a security agreement between a commercial lender and the debtor where the lender has advanced the money to the

3. *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir.2000) (quoting *Andersen v. Chrysler Corp.*, 99 F.3d 846, 856 (7th Cir. 1996)).

4. 26 U.S.C. § 6321.

5. *Id.* § 6322.

6. *Id.* § 6323.

7. *Shawnee State Bank v. United States*, 735 F.2d 308, 310 (8th Cir.1984).

8. *See* S.Rep. No. 1708, 89th Cong., 2nd Sess. 8 (1966–2 C.B. 876, 881), U.S.Code Cong. & Admin.News 1966, 3722, 3729.

9. *Plymouth Savings Bank v. United States I.R.S.*, 187 F.3d 203, 206 (1st Cir.1999) (quoting 26 U.S.C. § 6323(c)(1)(A)(i)).

debtor within 45–days after the tax lien filing and without actual notice of the tax lien.[10] To be eligible for the CTFA protection—to be "qualified property"—the loan must be secured by "commercial financing security" acquired by the taxpayer before the lien priority date.[11] The term "commercial financing security" is defined by statute as including four types of property: paper of a kind ordinarily arising in commercial transactions (including paper giving contract rights[12]); accounts receivable; real property mortgages; and inventory.[13] As relevant to that part of the Internal Revenue Code, a "contract right" is "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper."[14]

Applying these rules to the case before it, the court must determine whose security interest in the Disputed Cash has priority. As required by § 6323(c), to have priority over the government's tax lien AIF must demonstrate that (1) the security agreements were entered into before the tax lien filing; (2) the loans to Nightime were extended before the tax lien or within 45–days afterwards, without AIF's actual knowledge of the tax lien; and (3) Nightime acquired the collateral within 45–days after the tax lien filing.[15] Points one and two are undisputed: AIF indisputably entered into and perfected its security interest prior to the tax lien filing, and it loaned its money to Nightime well before

the 45–day safe harbor period expired, all without any knowledge of the tax lien. Therefore, the central issue remains whether Nightime acquired rights in the collateral within 45–days after the tax lien was filed.

In determining whether Nightime acquired rights in the collateral within the 45–days following the tax lien filing, the court must first properly define the collateral at issue in this case—the disputed cash. How collateral is defined is related to the determination of when a debtor acquires its collateral. Relevant to this case, a contract right is acquired by a taxpayer "when the contract is made."[16] Conversely, an account receivable (defined by the regulations as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper"[17]) is not acquired until "the time, and to the extent, a right to payment is earned by performance."[18] The way in which the court ultimately defines the Disputed Cash will determine whether AIF or the government is entitled to it.

As in *Bremen Bank & Trust Co. v. United States*, the Eighth Circuit case heavily relied upon by the government, "[t]he difficulty in categorizing the collateral in this case arises because accounts receivable can also be the proceeds of contract rights."[19] If the Disputed Cash is

---

10. *See id;* 26 C.F.R. § 301.6323(c)–1(b).

11. *Id.* § 6323(c)(2)(B).

12. Treas. Reg. (26 C.F.R.) § 301.6323(c)–1(c).

13. 26 U.S.C. § 6323(c)(2)(C).

14. 26 C.F.R. § 301.6323(c)–1(c)(2)(i).

15. *See Bremen Bank & Trust Co. v. United States,* 131 F.3d 1259, 1263 (8th Cir.1997).

16. 26 C.F.R. § 301.6323(c)–1(d).

17. *Id.* § 301.6323(c)–1(c)(2)(ii).

18. *Id.* § 301.6323(c)–1(d).

19. *Bremen,* 131 F.3d at 1264.

accounts receivable that arise from contract rights held by Nightime (established by the Provider Contracts), then "the accounts receivable (as proceeds) are deemed to be acquired for purposes of determining priority when the original contract rights were acquired." [20] If this is so, then AIF clearly has priority in the fight for the Disputed Cash because the Provider Contracts were signed long before June 28, 2002. "If, however, the accounts receivable cannot be correctly characterized as the proceeds of contract rights, the federal tax lien prevails over [AIF's] security interest." [21] Thus, the crucial issue the court must decide is whether Nightime acquired "contract rights" under its Provider Contracts, such that Nightime's later generated accounts receivable with its patients were the proceeds of those contract rights.

■ As stated in the IRS's regulations, "Identifiable proceeds, which arise from the collection or disposition of qualified property by the taxpayer, are considered to be acquired at the time such qualified property is acquired ...." [22] AIF has argued that the Disputed Cash is simply proceeds of the Provider Contracts, meaning it stems from its interest in "contract rights" and are not proceeds of accounts receivable. If so, argues AIF, it matters not when Nightime actually provided the medical services giving rise to the Disputed Cash. Rather, AIF contends that because the contractual relationships between Nightime and its providers existed before the filing of the tax lien, and because Nightime provided services to the insureds of the Providers under the terms of the Provider Contracts, AIF holds a superior lien upon all Insurance Receivables of Nightime. AIF argues this is so despite the critical fact that the actual health care services giving rise to the right of payment was rendered after June 28, 2002 (the last day of the safe harbor period).

The government's position is two-fold: first, the security agreement agreed to between AIF and Nightime did not include contract rights; and second, even if it did, the proceeds arise from accounts receivable and not contract rights. While the government may be correct in its argument that the security agreement did not include "contract rights," that issue need not be decided if the court finds that the Disputed Cash is composed of proceeds from accounts receivable and not from contract rights. On this issue, the government argues that even if contract rights are included in the agreement, it has priority over the Disputed Cash because Nightime had no choate right to payment, and therefore had no contract right as to the Disputed Cash. In short, the government argues, Nightime simply had a right to acquire an accounts receivable. And because an account receivable is acquired only at the time a right to payment is earned by performance, AIF's security interest extends only to accounts receivable that came into existence on or before the lien priority date of June 28, 2002.

■ In defining the collateral, the court looks to state law: "in the application of the federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in

---

**20.** *Id.* at 1264.

**21.** *Id.*

**22.** 26 C.F.R. § 301.6323(c)–1(d).

the property."[23] Under the current version of Utah's Uniform Commercial Code (UCC) AIF's security interest does not extend to "contract rights," but rather to "health-care-insurance receivables" (categorized by statute as "accounts") as defined by Utah law. AIF contends that the current version does not apply, but that the Utah UCC in place at the time the Provider Contracts were formed controls the transaction. This could be important, because the prior version (unlike the current version) did not specifically mention "health-care-insurance receivables." To support its position that the old Utah UCC applies, AIF cites a Pennsylvania case which held that the changes made to the state's UCC were not retroactive.[24] That decision, like others throughout the country, rests on the premise that *"in the absence of clear language to the contrary,* statutes must be construed to operate prospectively only."[25] The Pennsylvania Court found no "language to the contrary" in the new statute. In contrast, the Utah legislature clearly stated its intent that the new version be retroactively applied. The statute directs: "Except as otherwise provided in this part, this act applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before this act takes effect."[26] Based on the unambiguous language in the statute, the court must retroactively apply the current version of the Utah UCC to this case, including its new provisions regarding health-care-insurance receivables.

In the current Utah UCC, health-care-insurance receivables are a type of collateral expressly included in the "accounts" category, and not in any other (including general intangibles). The Utah UCC defines health-care-insurance receivables as "an interest in or claim under a *policy of insurance* which is a right to payment of a monetary obligation for health-care goods or services provided."[27] Based on that definition, the Insurance Receivables paid to Nightime would seem to be "health-care-insurance receivables" as defined by the statute.

The court finds unpersuasive AIF's argument that the Disputed Cash stems from "contract rights" (assumed by AIF to be included in "general intangibles") and not from "accounts" by way of health-care-insurance receivables. AIF asserts that the "health-care-insurance receivables" definition is inapplicable here because the Disputed Cash was not paid under a "policy of insurance." Instead, contends AIF, the Disputed Cash was paid pursuant to the Provider Contracts between Nightime (the provider) and the various health care insurers. This is in contrast to the separate contracts the patients being treated by Nightime had with the Providers, which AIF contends would constitute "policies of insurance" as defined in the Utah UCC. In short, AIF asserts that the use of the phrase "policy of insurance" refers only to those contracts between insurance companies and the patients they insure, and not to the contracts between a service provider

---

**23.** *See Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

**24.** *Commercial Nat'l Bank of Pa. v. Seubert & Assoc., Inc.,* 807 A.2d 297, 303 (Pa.Super.2002).

**25.** *Id.* (emphasis added). *See also, e.g., Gallant v. County Comm'n of Jefferson County,*

212 W.Va. 612, 575 S.E.2d 222, 228 (2002); *Carelli v. Hall,* 279 Mont. 202, 926 P.2d 756, 761 (1996).

**26.** Utah Code Ann. § 70A–9a–702(1).

**27.** *Id.* § 70A–9a–102(46) (emphasis added).

and an insurer. While AIF's argument is creative and well-argued, it is ultimately unconvincing. As the definition plainly states, a "health-care-insurance receivable" is "an interest in or claim under a policy of insurance which is a right to payment of a monetary obligation *for health-care goods or services provided.*"[28] As the government's brief cogently explains, a patient would not be entitled to payment by *providing* "health-care goods or services"—of course, the patient would *receive* such services. Therefore, it is obvious from the definition recited in the Utah UCC that the Disputed Cash resulted not from contract rights, but from health-care-insurance receivables. Coupling that finding with the statute's categorization of health-care-insurance receivables as "accounts," the court's conclusion must be that AIF's interest in the Disputed Cash arises not from its interest in "general intangibles," but from its interest in "accounts." Consequently, the government has priority over the Disputed Cash so far as it includes payments for services rendered after June 28, 2002.

Even if the court were to rule contrary to the statute's direction that the new version of the Utah UCC be retroactively applied, the outcome would be the same. If the court were to find that AIF's security interest included "contract rights," and that the recently added category of "health-care-insurance receivables" is inapplicable, it still would find for the government because those contract rights did not extend to the proceeds resulting in the Disputed Cash. The Disputed Cash was the fruit of Nightime's performed services and did not result from the Provider Contracts. While the court does not dispute AIF's argument that Nightime had certain contract rights under the Provider Contracts, such rights were limited and did not extend to the funds resulting in the Disputed Cash. To clarify this conclusion, one need only remove the insurance provider from this case's set of facts. Once the Providers are removed, it leaves Nightime (the debtor) and AIF (the secured party). By ignoring the Providers and examining a transaction typical to those that generated the Disputed Cash, the picture becomes clearer: Assume Nightime is open for business and that it enters into a security agreement with AIF, granting to AIF a security interest in, among other things, after-acquired accounts. Patient John Doe falls and breaks his leg. John Doe is treated by Nightime. Nightime bills John Doe for services rendered. Because AIF has a valid security interest in all of Nightime's accounts receivable, AIF's security interest attaches to John Doe's account receivable as soon as Nightime renders its services. Furthermore, once John Doe pays his account with Nightime, AIF holds a continually perfected security interest in the proceeds generated by that account receivable. This is a very basic and seemingly uncontroversial example of an accounts receivable. There is no reason why inserting an insurance provider changes the picture; the material facts remain the same—a secured party, a debtor, and an account receivable. The insertion of a third-party in the form of an insurance provider does not change the character of the collateral—it remains an account receivable. Thus, the court agrees with the government's argument that the Provider Contracts simply guaranteed payment on Nightime's accounts receivable, but the accounts receivable themselves were wholly independent of the Provider Contracts.

Finally, the court agrees with the government's argument that Nightime, by

**28.** *Id.* § 70A–9a–102(46) (emphasis added).

performing services, created an account receivable and that the accounts receivable were not dependant on or a result of the Provider Contracts. Only when an account receivable is created between Nightime and a patient do the Provider Contracts become significant. Therefore, in essence, the Provider Contracts are dependent on the accounts receivable and not, as AIF argues, independent of the accounts receivable. To further illustrate that the accounts receivable were not dependant on the Provider Contracts, the court considered possible remedies Nightime or any of the insurance providers would have if the Provider Contracts were not enforced. At the oral argument, counsel for both parties referred to an example of a builder: A homeowner contracts with a builder to build a house. The homeowner promises to pay the builder $100,000 upon completion of the home. If the builder later refuses to build the home, the homeowner has a breach of contract claim against the builder. Likewise, if the homeowner refuses to pay the builder upon completion of the home, the builder has a legal action against the homeowner. In short, there was a right for payment that was immediately created once the agreement between the homeowner and the builder was reached. In contrast, no such right to payment was created when the Provider Contracts were formed. When Nightime signed the Provider Contracts, Nightime could not have brought a breach of contract claim against the insurance companies until it provided medical services. The same was true for the insurance companies—the insurance companies, at the time they entered into the agreement with Nightime, could not have brought a breach of contract claim against Nightime until it failed to provide services. In other words, unless and until an independent third party (a patient) became involved, there was no performance that either party could force the other to do. In order for a remedy to be possible, both parties were required to wait until Nightime performed services and through those services created an account receivable.

For all these reasons, the court finds that the Disputed Cash stems not from contract rights acquired through the Provider Contracts, but are proceeds from health-care-insurance receivables (a form of accounts receivable). Consequently, unless the receivables were for services Nightime rendered prior to June 28, 2002, the government's interest in the Disputed Cash has priority.

## CONCLUSION

The court holds that because the Disputed Cash resulted from health-care-insurance receivables, which are categorized as accounts by the Utah UCC, and because such proceeds are subject to the government's tax lien (after the expiration of the safe harbor period), the court GRANTS the government's motion for partial summary judgment [38–1]. Consequently, the court DENIES AIF's motion for partial summary judgment [40–1]. In light of these rulings, as understood from counsels' representations during oral argument, all that remains is an accounting regarding the Disputed Cash. The court directs both parties to meet and confer to attempt to resolve this question. Should a mutually-agreed number not be reached within 45–days of this order, the government shall file its position with the court explaining its view as to the appropriate judgment. Thereafter, AIF shall have 21–days to respond to the government's position.

SO ORDERED.