**PINE BUILDERS, INC.**

v.

**The UNITED STATES of America.**

**Civ. A. Nos. 75–0250–R, 75–0251–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

March 19, 1976.

ing plaintiff requests, and this Court cannot order the Governor to do so.

Walter F. Witt, Jr., T. S. Ellis, III, Frank A. Thomas, III, Richmond, Va., for plaintiff.

N. George Metcalf, Asst. U. S. Atty., Eddie Cantor, Henry A. Conner, Jr., Richmond, Va., for defendant.

## MEMORANDUM

WARRINER, District Judge.

This suit is a consolidation of two actions of interpleader filed pursuant to 28 U.S.C. § 1335 and Fed.R.Civ.P. 22 whereby defendants United States and Joseph M. Zamoiski Co., are adverse claimants to a sum of money which plaintiffs Pine Builders, Inc., and Parham Company have paid into the registry of this Court so that we may resolve the conflicting claims between defendants relative thereto. Jurisdiction is envoked under 28 U.S.C. §§ 1335, 1340, 2410.

On 30 December 1975 Pine and Parham filed their respective motions for summary judgment requesting that they be discharged from this proceeding and from any further liability with regard to the interpleader funds. With all interested counsel consenting this Court entered an order granting said motion. By agreement of counsel for the remaining parties the issue of priority in the funds has been submitted to the Court for a decision on the merits as evidenced by the pleadings, stipulations and depositions.

The Court makes the following findings of fact: In late June or early July of 1974 Industrial Carpet Sales, Inc. (Industrial) entered into an oral contract with Pine Builders, Inc. (Pine) and a separate oral contract with Parham Company (Parham). Industrial contracted to install carpeting and the necessary padding in approximately 1,000 apartments, 500 located at Chelsea Square and 500 located at Jarrett Apartments, constructed by Parham and Pine, respectively. The pricing of Industrial's services was on a per apartment unit basis. Pine and Parham were to pay Industrial on Friday of each work week for the number of apartments Industrial had completed through Wednesday of that work week. The contract between Industrial and Pine was identical to the contract between Industrial and Parham with variations only in the price per apartment unit.

Shortly after work on the contracts commenced Industrial's supplier of carpeting and padding, Joseph M. Zamoiski Company (Zamoiski), demanded security from Industrial as a prerequisite to continued supply, apparently because Industrial owed a considerable sum of money on an open account it had with Zamoiski. This demand was met by an agreement amongst Zamoiski, Industrial, Pine and Parham whereby Zamoiski continued to furnish the necessary carpeting materials to Industrial while Pine and Parham made the weekly checks payable jointly to Industrial and Zamoiski. Upon receipt of each check Zamoiski deducted a predetermined amount as indicated by specified invoices for materials furnished. This arrangement was substantially complied with from its inception through completion of the Chelsea and Jarrett projects. Zamoiski set up an account separate from the delinquent open account covering these transactions.

As additional security Zamoiski, required Industrial to enter into a Security Agreement that secured "all of the obligations" of Industrial to Zamoiski. Such obligations included the delinquent open account as well as the Pine-Parham account. On 15 July 1974 Zamoiski filed with both the State Corporation Commission of Virginia and the Clerk's Office of the County of Henrico a Financing Statement and Security Agreement describing the collateral as follows:

> All of Debtor's present and future accounts receivable, general intangibles, contract rights, returned, repurchased, repossessed goods, and monies due and to

become due from banks, credit card companies, and other issuers of credit cards.

All of Debtor's contract rights now and hereafter arising from all present and future contracts and agreements between Debtor and Gumenick Properties for the furnishing by Debtor of goods and/or services for Chelsea Square Apartments and Jarrett Apartments and all of Debtor's accounts receivable now and hereafter arising from the aforesaid agreements, contracts or furnishing of goods and/or services and all returned, repurchased and repossessed goods.

During the course of these projects, Industrial suffered severe financial reverses and consequently was unable to pay federal withholding and other taxes which were, as of their assessment dates, in the amounts as follows: 10 February 1975—$7,438.04; 24 March 1975—$4,755.35; 12 May 1975—$218.40. As a result federal tax liens, pursuant to 26 U.S.C. § 6321, arose in favor of the United States for the amount of Industrial's tax liability.

Subsequently the government filed notice of these liens, in compliance with the Federal Tax Lien Act, Code § 6323, with the State Corporation Commission of Virginia on the respective dates of 20 February 1975, 27 March 1975 and 13 May 1975.

On 20 May 1975 the government served, pursuant to 26 U.S.C. § 6155, Notice of Final Demand on both Pine and Parham. At that time Pine and Parham owed a sum total of $19,900.36 to Industrial for services rendered under the aforementioned contracts. Being confronted with demands from the government, Industrial, and Zamoiski and realizing reasonable doubt existed as to which party was entitled to what portion, if any, of the funds, Pine and Parham filed interpleader actions with this Court which have been consolidated into one suit.

The sole issue for the Court to resolve is whether Zamoiski has rights as a secured creditor which are entitled to priority over the federal tax liens on the funds deposited herein by Pine and Parham.[1]

Where the federal government is a competing lienor the question of priorities is determined by reference to federal law. *Agsten and Sons, Inc. v. Huntington Trust and Savings Bank,* 388 F.2d 156 (4th Cir. 1967) *cert. denied* 390 U.S. 1025, 88 S.Ct. 1413, 20 L.Ed.2d 282 (1968); *Purcell v. Henson,* 405 F.Supp. 1130 (E.D.Va.1975). It is undisputed that the Federal Tax Lien Act of 1966 (FTLA) 26 U.S.C. §§ 6321, 6323 is controlling in this case. The purpose of the Act, we believe, was to fit tax liens into the priority scheme of the UCC.[2]

The priority of a federal tax lien provided by Code Section 6321 as against liens created by State law is governed by the rule-first in time first in right. *United States v. City of New Britain,* 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954). In order to apply the first in time first in right rule the times at which the federal tax lien and the competing State created lien came into existence and became valid must be determined. *United States v. Pioneer American Insurance Co.,* 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963).

A federal tax lien arises when the tax is assessed, 26 U.S.C. § 6322. However, it is not valid as against a holder of a "security interest" until notice thereof has been filed in accordance with 26 U.S.C. § 6323(a), (f). The dates are clear with respect to the filing of the government's tax lien notices. Thus, the issue narrows down to a determination of the time at which Zamoiski became the "holder of a

---

1. The Court acknowledges the arguments presented in the briefs relative to federal lien priority "choatness." However, we have serious doubts as to its applicability under FTLA Code § 6323, which we find to be controlling in this case. In any event we hold that within the context of tax liens, collateral consisting of a right to payment for services rendered, wheth- er or not earned by performance, is choate. *Hammes v. Tucson Newspapers, Inc.* 324 F.2d 101, 103 (9th Cir. 1963); H.R.Rep.No.1884, 89th Cong., 2d Sess. 1 (1966). The Court thus dispenses with this issue.

2. H.R.Rep.No.1884, 89th Cong., 2d Sess. 1 (1966).

security interest" in the funds deposited with the Court within the meaning of Code Section 6323(a).

Code Section 6323(h)(1) defines the term security interest as follows:

(1) *Security interest.*—The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.

The House Ways and Means Committee Report states further in this regard, H.R. Rep.No.1884, *supra* at 49:

A security interest must be in existence, within the provisions of section 6323(h)(1), at the time as of which its priority as against a Federal tax lien is determined. For example, a security interest, to be afforded priority under section 6323(a), as amended by the bill, must be in existence within the meaning of subsection (h)(1) before notice of tax lien is filed.

For purposes of subsection (h)(1), a security interest becomes protected against a subsequent judgment lien on the date on which all actions required under local law to establish the priority of the security interest against such a judgment lien have been taken, or, if later, the date on which all such actions are deemed effective, under local law, to establish such priority. . . .

The undisputed facts show that on 15 July 1974 Zamoiski, pursuant to an agreement with Industrial and for the purpose of securing present and future obligations of Industrial to Zamoiski, perfected its security interest in the "property" of Industrial then in "existence" that was subject to the security agreement filed on that date. It is undisputed that under Virginia law such perfection would protect Zamoiski's interest in existing property of Industrial from a subsequent judgment lien arising out of an unsecured obligation. It is also undisputed that, although the nature of Industrial's right in the funds in question, if any, is controverted, that right, whatever it may be, was subject to the security agreement if and when the right accrued to Industrial. Additionally, the undisputed facts show that Zamoiski departed with "money or moneys worth" prior to the filing of the tax lien notices.

Hence, the issue further narrows down to whether or not, prior to the filing of the tax lien notices, Industrial's rights, if any, in the funds deposited with this Court constituted "property" in "existence" under FTLA Code Section 6323(h)(1).

■ Code Section 6323(h)(1) is silent as to whether federal or State law is applicable in determining whether property is in existence under its provisions. This Court finds that State law should be applied. *Nevada Rock and Sand Co. v. United States*, 376 F.Supp. 161, 168 (D.Nev.1974). *But see Texas Oil and Gas Corp. v. United States*, 466 F.2d 1040, 1049 (5th Cir. 1972). The FTLA was enacted with the intent of conforming federal tax lien laws to the concepts developed in the Uniform Commercial Code (UCC). H.R.Rep.No.1884, 89th Cong., 2d Sess. 1 (1966). Since the UCC has been adopted by virtually every State, naturally State legislatures and courts are better suited than Congress and federal courts to further develop the law of secured transactions insofar as harmonizing the UCC with the FTLA so that the concepts developed in the UCC are not thwarted and the purpose behind FTLA is furthered.

In light of the foregoing reasoning and of the context in which the phrase "property in existence" is used, the Court finds that the Virginia UCC provides a sufficient and most appropriate source for deciphering its meaning. Va.Code Ann. §§ 8.9–105(c), 106 (Cum.Supp.1975) *as amended,* respectively, state in pertinent part:

"*Collateral*" means the *property* subject to a security interest, and includes *accounts* . . . . (emphasis added). *Id.* § 105(c).

"Accounts" means any right to payment for . . . services rendered which is not evidenced by an instrument or chattel paper, *whether or not it has been earned by performance* . . . . (emphasis added) *Id.* § 8.9–106.

■ The above definition of collateral describes accounts as property thus presuming that existing accounts constitute property in existence under the Virginia UCC. Clearly the contracts between Industrial and Pine and Parham come within the meaning of the term account as defined above in that they created rights for services rendered.[3] Equally clear, these contracts come within the above definition of collateral in that they constitute accounts covered by the security agreement between Industrial and Zamoiski and thus were subject to Zamoiski's security interests in them. Thus, when these contracts were created, that is when the rights to payment for services rendered were established, whether conditionally or absolutely, property of an incorporeal nature came into existence for the purposes of the Virginia UCC and, we find, for the purposes of the FTLA.

■ The right to payment for services rendered, whether or not earned by performance, is property in existence under the FTLA. An existing right to property (in this case a contractual right to receive money for services to be rendered) is *itself* property in existence under the Act. It matters not that fruition of the right is *in futuro* or conditioned upon a corresponding duty on the part of the holder of the right. The subject of the right, that is, the money to be received for services to be rendered is part and parcel of that right at the time the right is created (in this case when the contracts were entered into) regardless of when the money is actually to be paid or when the right thereto becomes absolute:

There is supporting legislative history, if any is needed, for the interpretation just urged. For example, it is clear from more than one source that contract rights are a species of property envisioned as being a proper subject of a security interest under the Act. *While the specific discussion of contract rights in the legislative history relates to subsection (c) of Section 6323, it should be stressed that the recognition of security interests in contract rights as qualifying for the "superpriority" provided by subsection (c) necessarily involves recognition that they qualify for the normal priority of subsections (a) and (h)(1).* Contract rights, by definition under the U.C.C., are rights to payment under a contract "not yet earned by performance." *Thus, Congress necessarily embraced the concept that rights to payments not yet earned by performance arising under existing assigned contracts are in esse and such a security interest will prevail over a later federal tax lien.* Any other interpretation would necessarily involve a rejection of the idea that contract rights are a proper subject for a security interest because, if the payment under the contract had to be unconditionally payable or earned by performance, we would no longer be dealing with contract rights. (emphasis added-citations omitted).

Creedon, *Assignments For Security and Federal Tax Liens,* 37 Fordham L.Rev. 535, 563 (1969).

To the same effect is *Consolidated Film Industries v. United States,* 17 U.C.C.Rep. 1354 (D.Utah, 1975); *Centex Construction Co. v. Kennedy,* 332 F.Supp. 1213, 1215 (S.D.Texas 1971). It should be noted that the term "contract right" referred to in the above quotation is now subsumed within the term "account" under Va. UCC defini-

3. This is true regardless of whether the Court finds as a matter of fact that those contracts were created pursuant to Industrial's promise to perform, with the rights therein established prior to but conditioned upon performance, or that they were created in serial form, with separate and distinct rights established respectively and absolutely, upon completion of each apartment unit by Industrial.

tions. Va.Code Ann. § 8.9–106 (Cum.Supp. 1975).

The Court still has to resolve the factual question—at what point in time were Industrial's rights to payment of the funds herein, whether conditional or otherwise, created? In so doing the Court deems it important to note a crucial exception to the above quoted passage reading "if the payment under the contract had to be unconditionally payable or earned by performance we would no longer be dealing with contract rights." *Creedon, supra* at 563.

 The exception is unilateral contracts. With this type of contract acceptance is performance. Thus a unilateral contract, and the rights created therein, arise only when the contracting party completes performance of the acts called for. At no point is he bound to perform nor does he have any contractual rights prior to completion.

All parties concerned agree that the subject of the contracts herein was payment for services rendered—the carpeting of the apartments. The factual issue is whether the contracts came about as a result of mutual promises on the part of Industrial and Pine and Parham whereby Industrial was to perform *all* the carpeting services required in both projects at a set price per unit or whether the initial agreements were only as to price per unit with the effect that the completion of each apartment unit by Industrial amounted to acceptance of a unilateral contract offered by Pine and Parham. If the former is correct then Industrial's rights in the funds herein were created in July of 1974 when the agreements between Industrial and Parham and Pine were entered into. If the latter is correct than Industrial's rights in the funds were created when the carpeting for which the funds were payment was completed. In other words if the agreements constituted bilateral contracts covering each project in its entirety, Industrial's rights to the funds were created and Zamoiski's corresponding security interests therein came into existence well before any of the tax lien notices were filed. But if the agreements merely

set the price for a series of unilateral contracts then there remain serious questions over priorities between Zamoiski and the government as to the funds.

With respect to this issue the government states in its reply brief on page 4 that:

> There is positively no evidence of any binding obligation on the plaintiffs to engage Industrial for the entire project, nor on Industrial that it bound itself to complete 500 apartments in each complex.

Despite the emphatic posture of the government's contention the evidence is to the contrary. Thomas T. Vincent, president and sole stockholder of Industrial, who negotiated the contracts in question, was deposed on behalf of the government and stated the following:

> The Contract or agreement was to carpet approximately a thousand apartments, 500 located in the Jarrett Apartments and 500 located at Chelsea Square; we were to use Mohawk Carpet and Cushion; they were to pay us a stated price for each unit and were to pay us on Friday for work done through Wednesday. They were to make the checks payable to Industrial Carpet Sales and Joseph M. Zamoiski Company.

Ignoring Vincent's deposition, the government relies on the depositions of Abe Pfeffer who negotiated the contracts in issue on behalf of Pine and Parham. Even so, we find that Pfeffer's account of the negotiation substantiates Vincent's account.

Pfeffer was deposed twice on behalf of the government, once with regard to the Industrial-Pine agreement and once with regard to the Industrial-Parham agreement.

In the Industrial-Pine deposition the following colloquy occurred in response to counsel's questions:

> Q. When did performance *under the agreement* commence and end. When did it begin and how long did it take place and when was it completed? (Emphasis added)

A. It was completed the week of May 14, 1975, and it commenced the early part of July, 1974.

In the Industrial-Parham deposition this exchange ensued between the counsel and Pfeffer:

Q. Now this work commenced in July of 1974?

A. Yes, Sir.

Q. I just want to cover the scope of *the contract*; for how long did this continue? (emphasis added)

A. This practice?

Q. *The contract,* the installation of the carpeting. (Emphasis added)

A. Until the job was completed. Talking about Chelsea now?

Q. Yes.

A. This job was completed in May of 1975.

█ The Court submits that if all it had to go on were the Pfeffer depositions the question of the nature of the contracts might be a close one notwithstanding the above quoted passages. But reading the Pfeffer and Vincent depositions together, the Court finds them clearly supportive of the conclusion that the contracts were bilateral in nature and covered each project in its entirety. Thus, Industrial's contractual rights, and Zamoiski's corresponding security interest, in the funds in question were unconditionally established, and for the purposes of the FTLA, in existence in July of 1974, the month in which the Industrial-Pine and Parham contracts were made and the Zamoiski-Industrial security agreement was filed. Only performance remained to bring the account to fruition. The earliest tax lien notice being filed in February of 1975, Zamoiski's lien was prior in time and superior in right to that of the government's lien.

For these and the foregoing reasons the Court will enter judgment in favor of Zamoiski adjudging that it has a superior right over that of the government to the funds held in the registry of this Court.

An appropriate order shall issue.