**PLYMOUTH SAVINGS BANK, Plaintiff, Appellant,**

v.

**UNITED STATES INTERNAL REVENUE SERVICE and Massachusetts Department of Revenue, Defendants, Appellees.**

**No. 98–1930.**

United States Court of Appeals, First Circuit.

Argued Jan. 7, 1999.

Decided Aug. 12, 1999.

fails because of the lack of any nexus between the alleged cover-up and the injuries (and damages) that they claim.

Howard M. Brown, with whom Bartlett, Hackett, Feinberg, Gentilli, Liston, Brown & Phalen, P.C., was on brief, for appellant.

William S. Estabrook, Attorney, Tax Division, Department of Justice, with whom Loretta C. Argrett, Assistant Attorney General, Donald K. Stern, United States Attorney, and Annette M. Wietecha, Attorney, Tax Division, Department of Justice, were on brief, for appellees.

Before SELYA, Circuit Judge, CUDAHY,* Senior Circuit Judge, and STAHL, Circuit Judge.

* Of the Seventh Circuit, sitting by designation.

CUDAHY, Senior Circuit Judge.

Jordan Hospital ("Hospital") owed Shirley Dionne ("Dionne") $75,000. Dionne, in turn, was indebted to the Plymouth Savings Bank ("Bank") and the Internal Revenue Service ("IRS"), both of which held valid liens on the money the Hospital owed Dionne. The Hospital deposited the money with the district court, and we must now decide who is entitled to it. The problem is simply to determine which of the two liens has priority. We hold that the Bank's lien may trump the IRS's and therefore reverse the district court's grant of summary judgment in favor of the IRS.

Most of the facts are not in dispute. Dionne owned and operated the Greenlawn Nursing Home, a 47-bed state-licensed facility. On September 22, 1993 and apparently before extending credit, the Bank filed a financing statement with the state of Massachusetts describing and giving notice of its security interest in Greenlawn and other assets of Dionne. On April 13, 1994, Dionne executed an $85,000 promissory note in favor of the Bank. As security for the loan, Dionne granted the Bank a security interest in all of her tangible and intangible personal property individually, as well as in her capacity as a sole proprietor doing business as Greenlawn. Paragraph 2 of the agreement specifically granted the Bank: all cash and non-cash proceeds resulting or arising from the rendering of services by Dionne; all general intangibles including proceeds of other collateral; and all inventory, receivables, contract rights or other personal property of Dionne. On or about December 1, 1994, Dionne defaulted on her $85,000 obligation to the Bank, leaving some $65,465 unpaid.

Dionne's financial troubles did not end there. She failed to make Federal Insurance Contribution Act, 26 U.S.C. § 3101, *et seq.* (FICA), payments of $19,639 for the second quarter of 1994. The IRS assessed liability on September 19, 1994 and filed a federal tax lien in the district court on December 19. Dionne again failed to make FICA payments of $62,767 for the fourth quarter of 1994. Liability was assessed on February 2, 1995 and a lien was filed on February 14.

On March 31, 1995, Dionne signed a contract in which she agreed to help the Hospital obtain a license to operate a skilled nursing facility in exchange for $300,000, payable in three installments. Dionne would receive $25,000 when she signed a letter of intent, $200,000 when Massachusetts approved a license and the final $75,000 two years after the license-approval date. With Dionne's assistance, by mid-May 1995 the Hospital had received approval for its license and had paid Dionne the first two installments, totaling $225,000. (In practical effect, it appears that Dionne transferred her Greenlawn license to the Hospital.). The Hospital never paid Dionne the $75,000 balance.

The Bank sued the Hospital in Massachusetts state court to recover the unpaid balance of its loan to Dionne. Considering cross-motions for summary judgment, the state court ruled for the Bank. It found that, pursuant to the contract between Dionne and the Hospital, the $75,000 constituted cash proceeds arising from the rendering of personal services by Dionne. Because the security agreement between the Bank and Dionne expressly covered "proceeds" of services, the court held that the Bank had a secured interest in the money. The court rejected the Bank's argument that the security interest attached to the nursing home license or to proceeds of the transfer of that license. Instead of awarding the $75,000 to the Bank, however, the court directed the Bank to bring a declaratory judgment action to determine whether its interest in the money had priority over that of other lien-holders.

Ever diligent, the Bank brought such an action—this one—which the IRS subsequently removed to the district court. The Hospital, content to let the Bank and the IRS do battle, deposited the $75,000 with the district court and exited from the ac-

tion. The Bank and the IRS filed cross-motions for summary judgment, each asserting that its lien trumped the other's. The court sided with the IRS. The Bank's right to recover as against the government depended on when Dionne had performed the services required by the contract, the .district court stated. And, although the record on the timing of Dionne's performance was sparse, the court determined that it was undisputed that she had not helped the Hospital secure approval of a nursing home license within the 45 days following the tax lien filing as required by the Federal Tax Lien Act, 26 U.S.C. §§ 6321, 6323(c) (FTLA). *See* Dis. Ct. Mem. Op. & Order at 18–19. Accordingly, the district court held that the IRS's two liens were superior to the Bank's lien. The Bank appeals this decision, and we review *de novo* the district court's grant of summary judgment in favor of the government. *See, e.g., Trafalgar Capital Assoc., Inc. v. Cuomo,* 159 F.3d 21, 26 (1st Cir. 1998).

 When an individual fails to pay her taxes after a demand has been made, the FTLA grants the United States a lien "upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. The lien also attaches to property acquired by the delinquent taxpayer after the initial imposition of the lien. *See, e.g., Glass City Bank v. United States,* 326 U.S. 265, 267, 66 S.Ct. 108, 90 L.Ed. 56 (1945). Section 6323 of the FTLA, however, gives certain commercial liens priority over federal tax liens. Pursuant to § 6323(a) and as defined in § 6323(h), for example, tax liens are subordinate to security interests in a taxpayer's property that is "in existence" *before* the government files notice of the tax lien. (Subsection 6323(f) details the filing requirements.). And § 6323(c) extends the priority of these prior security interests to certain "qualified property" that the taxpayer acquires even *after* the government has filed a notice of the tax lien. The scope of this safe harbor for

after-acquired property under § 6323(c) is at issue here. Mindful that we are entering "the tortured meanderings of federal tax lien law, intersected now by the somewhat smoother byway of the Uniform Commercial Code [UCC]," *Texas Oil & Gas Corp. v. United States,* 466 F.2d 1040, 1043 (5th Cir.1972), we lay out the pertinent provisions with as much specificity as we can apply.

To fall within § 6323(c)'s safe harbor for after-acquired property, a security interest must be in "qualified property covered by the terms of a written agreement entered into before tax lien filing," including "commercial transactions financing agreement[s]." 26 U.S.C. § 6323(c)(1)(A)(i). The security interest must also be superior, under local law, to a judgment lien arising out of an unsecured obligation. *See id.* at § 6323(c)(1)(B). A "commercial transactions financing agreement" is defined as "an agreement (entered into by a person in the course of his trade or business) ... to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business," *id.* at § 6323(c)(2)(A)(i), and must be entered into within 45 days of the date of the tax lien filing. *See id.* at § 6323(c)(2)(A). "Commercial financing security" can include, among other things, "paper of a kind ordinarily arising in commercial transactions" and "accounts receivable," *id.* at § 6323(c)(2)(C), and it must be "acquired by the taxpayer before the 46th day after the date of tax lien filing." *Id.* at § 6323(c)(2)(B).

The relevant Treasury regulations include still more definitions. "Paper of a kind ordinarily arising in commercial transactions" means "any written document customarily used in commercial transactions," and includes "paper giving contract rights." 26 C.F.R. § 301.6323(c)–1(c)(1). For purposes of the FTLA, a "contract right" is "any right to payment under a contract not yet earned by performance and not evidenced by an instrument

or chattel paper." *Id.* at § 301.6323(c)–1(c)(2)(i). "An account receivable is any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." *Id.* at § 301.6323(c)–1(c)(2)(ii).

Because Dionne signed the personal service contract with the Hospital exactly 45 days after the IRS filed notice of the second tax lien (February 14—March 31),[1] the fighting issue is whether by so doing she "acquired" rights to the $75,000, the money the Hospital owed Dionne and deposited with the district court. *See* 26 U.S.C. § 6323(c)(2)(B). If, by signing the contract, Dionne acquired rights to the money, then the Bank's lien trumps the IRS's. For, if that is the case, it is undisputed that the Dionne–Hospital contract is commercial financing security within § 6323(c)(2)(C) and that the Dionne–Bank agreement is a commercial transactions financing agreement within §§ 6323(c)(1)(A)(i) & (c)(2).[2] In this scenario, the Bank's security interest is in qualified property, and the $75,000 would fall within the safe harbor for after-acquired property. On the other hand, if Dionne did not acquire the rights to the money when she signed the contract, the IRS's lien takes priority.

The Treasury Department (of which the IRS is a part) has provided an answer. Recall that the potential qualified property here is the contract between Dionne and the Hospital, which granted Dionne certain rights to payments when she performed certain services. Before the 46th day after the tax lien was filed (that is, before April 1, 1995), if Dionne had acquired anything, she could only have acquired a contract right, not an account receivable, because she had yet to perform any services.

*See* 26 C.F.R. §§ 301.6323(c)–1(c)(2)(i) & (ii). The regulations provide that a "contract right ... is acquired by a taxpayer when the contract is made." *Id.* at § 301.6323(c)–1(d). So, Dionne acquired the right to be paid for services to be rendered in the future at the time she entered into that contract. In statutory terms, the commercial transactions financing agreement (the Dionne–Bank agreement), which was entered into well before the tax lien filing, covers the Bank's loan (the $85,000) to the taxpayer (Dionne). The loan in turn was secured by commercial financing security (the Dionne–Hospital contract). The Dionne–Hospital contract conferred contract rights (the right to be paid $75,000 two years after Massachusetts approved a nursing home license for the Hospital) and was acquired by the taxpayer within 45 days of the tax lien filing. *See* 26 U.S.C. §§ 6323(c)(2)(A) & (B). The contract, and the rights (even if conditional) under it, are therefore qualified property covered by the Bank's security interest and protected by § 6323(c)'s safe harbor.

■ Of course, the Bank is interested in the money, not the contract right. The regulations again point the way. "Proceeds" are "whatever is received when collateral is sold, exchanged, or collected." 26 C.F.R. § 301.6323(c)–1(d). The regulations further provide: "Identifiable proceeds, which arise from the collection or disposition of qualified property by the taxpayer, are considered to be acquired at the time such qualified property is acquired if the secured party has a continuously perfected security interest in the proceeds under local law." *Id.* Recall that the commercial financing security (the

---

**1.** The Bank does not claim that its lien should take priority over the first tax lien, filed on December 19, 1994. The duel here is between only the second tax lien (filed on February 14, 1995 and covering FICA payments of $62,767 for the fourth quarter of 1994) and the Bank's lien.

**2.** For purposes of the following discussion, we assume that if Dionne acquired the rights to the $75,000 within 45 days of the tax lien filing, she did so in the ordinary course of her trade or business as required by § 6323(c)(2)(B). The IRS challenges this assumption, and we discuss the issue later. *See infra* at 14–16.

Dionne–Hospital contract and the rights under it) is simply collateral for the loan (the Bank's $85,000 loan to Dionne). So, where the collateral is a contract giving contract rights, the proceeds of those rights, like the rights themselves, are considered to have been acquired at the time the contract was made. This is so even though the right to proceeds under the contract does not become unconditional until the contract is performed. Pursuant to the Treasury regulations, the conditional right to the proceeds relates back to the time the contract was formed and executed. Therefore, Dionne acquired the rights to the proceeds of the contract right on March 31, 1995, exactly 45 days from the date of the tax lien filing.

█ In this case, however, the proceeds of the contract right are simply an account receivable, the right to payment of $75,000 for services rendered by Dionne. *See* 26 C.F.R. § 301.6323(c)–1(c)(2)(ii). And herein lies the rub. The IRS argues that, pursuant to the regulations, a taxpayer acquires an account receivable "at the time, and to the extent, a right to payment is earned by performance." Echoing the district court, the IRS correctly points out that Dionne did not earn a *right to payment* before the 45 days. *See* Appellee's Br. at 18. But the contract and the rights under it, rather than the account receivable, are the qualified property at issue here, and the regulations provide that the proceeds of qualified property are deemed to be acquired at the time the qualified property is acquired. The regulations do not distinguish between forms of proceeds. Well then, the IRS parries, the account receivable cannot be "proceeds" because the contract was not "sold, exchanged, or collected." *See* 26 C.F.R. § 301.6323(c)–1(d). Had Dionne sold the contract, the IRS says, the Bank's lien would reach the proceeds of that sale; but performance (rendering the services) does not amount

to a sale. *See* Appellee's Br. at 18. This ingenious quibble is unconvincing. Dionne's rendering of the contracted-for services effectively "exchanged" her contract right, converting it into an account receivable. *See* 26 C.F.R. § 301.6323(c)–1(d). The IRS has given us no good reason, nor can we find any basis in commercial reality, to distinguish between a "sale" or an "exchange" and a conversion by performance for this purpose. In fact, performance would seem to be necessary for the production of proceeds even if there were a sale or exchange of the contract. We therefore conclude that the account receivable, the right to the $75,000, is the proceeds of the contract right.

To this, the IRS responds by complaining that we have expanded too far § 6323(c)'s safe harbor for after-acquired property. It cites legislative history which it claims suggests that Congress intended § 6323(c)'s protections to extend only to property that was *collected* within 45 days of the tax lien filing. *See* Appellee's Br. at 17 (citing S. Rep. No. 1708, 89th Cong., 2d Sess. (1966), at 2, 8). We find this argument unpersuasive. As an initial matter, this Senate Report does not directly address commercial financing secured by contract rights, the precise issue here. The Report does indicate, however, that the FTLA was "an attempt to conform the lien provisions of the internal revenue laws to the concepts developed in [the UCC]." S.Rep. No. 1708, 89th Cong., 2d Sess., at 2. The Treasury regulations reflect this intent by providing definitions for FTLA terms that closely track UCC definitions of like terms. For example, the FTLA definitions of "contract right" and "account receivable" match the pre–1972 revision definitions of "contract" and "account," *compare, e.g.,* 26 C.F.R. §§ 301.6323(c)–1(c)(i) & (ii) *with* Mass. Gen. Laws Ann. ch. 106, § 9–106 (West 1998) (Official Reasons for 1972 Changes),[3] and the two defi-

---

3. Massachusetts has adopted the 1972 version of article 9 of the UCC. That version eliminated the term "contract right" as unnecessary.

The FTLA, enacted in 1966, retains the pre-revision "contract right"-"account receivable" dichotomy.

nitions of the term "proceeds" are almost identical, *compare* 26 C.F.R. § 301.6323(c)–1(d) *with* Mass. Gen. Laws Ann. ch. 106, § 9–306(a) (West 1988) (defining "proceeds" as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds"). Our conclusion that the Bank's security interest in the contract rights covers the proceeds of those rights—even if the proceeds are accounts receivable—is compatible with still other provisions of the UCC. *See, e.g.,* Mass. Gen. Laws Ann. ch. 106, § 9–306(2) (West 1980) (providing that security interests extend to the proceeds of all secured property). In all events, whatever Congress intended, the regulations make it clear that, so long as the contract was entered into within 45 days of the tax lien filing, the rights under that contract and *all of the proceeds* of those rights fall within § 6323(c)'s protective bounds.

This conclusion can hardly come as a surprise to the IRS. The IRS has advanced the same arguments which it uses here in cases analogous to this one, and has lost each time (except, of course, below). *See Bremen Bank & Trust Co. v. United States,* 131 F.3d 1259 (8th Cir. 1997); *State Bank of Fraser v. United States,* 861 F.2d 954 (6th Cir.1988); *In re National Fin. Alternatives, Inc.,* 96 B.R. 844 (Bkrtcy.N.D.Ill.1989).[4] Each of these cases, like this one, turned neither on a clever interpretation of the FTLA nor on a thorough scouring of the Congressional records in an attempt to divine intent, but instead on a plain reading of the regulations. It is that simple: the regulations governing § 6323(c) say that contract rights and the proceeds thereof are acquired at the time the parties enter into the contract. It matters not that the proceeds of that contract right might be accounts receivable because the regulations do not distinguish among different kinds of proceeds. The IRS, which promulgates these regulations, has had ample opportunity to rewrite them to better suit its desired interpretation of the statute. (Congress, of course, might yet disagree.) To our knowledge, it has made no such effort.

■ One issue remains. The IRS, reminding us that we "can affirm a correct judgment on any ground," Appellee's Br. at 20 (citing *Levy v. FDIC,* 7 F.3d 1054, 1056 (1st Cir.1993)), argues that Dionne did not enter into the contract with the Hospital "in the ordinary course of [her] trade or business" as required by § 6323(c)(2)(A)(i). Normally, we will consider only those issues that the district court considered below, *see, e.g., St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1205 (1st Cir. 1994), and can "affirm a correct district court's ruling on any ground *supported in the record...*," *Levy,* 7 F.3d at 1056 (emphasis added)(internal quotation and citation omitted). In this case, not only did the district court fail to address the "ordinary course of business" element, both parties also acknowledge[5] that the record

---

4. *Cf. Centex Constr. Co. v. Kennedy,* 332 F.Supp. 1213, 1215 (S.D.Tex.1971) ("it seems plausible that the [FTLA] would recognize as being property in existence, any binding contract which may involve future payments yet 'unearned by performance'"); *Pine Builders, Inc. v. United States,* 413 F.Supp. 77, 82 (E.D.Va.1976) ("The right to payment for services rendered, whether or not earned by performance, is property in existence under the FTLA. An existing right to property (in this case a contractual right to receive money for services to be rendered) is itself property in existence under the Act. It matters not that fruition of the right is in futuro or conditioned upon a corresponding duty on the part of the

holder of the right. The subject of the right, that is, the money to be received for services to be rendered is part and parcel of that right at the time the right is created (in this case when the contracts were entered into) regardless of when the money is actually to be paid or when the right thereto becomes absolute.").

5. The Bank claims that the factual record on this point is "scanty." Appellant's Reply Br. at 7. The IRS, for its part, can only speculate as to the ordinary course of Dionne's business. *See* Appellee's Br. at 19 ("taxpayer *appears* to have been in the business ...") (emphasis added).

is undeveloped on this point.[6] Because the record is so undeveloped, and because trade-or-business determinations are highly fact-intensive, *see, e.g., Higgins v. Commissioner,* 312 U.S. 212, 217, 61 S.Ct. 475, 85 L.Ed. 783 (1941); *Deputy v. du Pont,* 308 U.S. 488, 496, 60 S.Ct. 363, 84 L.Ed. 416 (1940), we decline the IRS's invitation to affirm the district court on this ground. However, the parties are free to develop the factual record on remand to the district court.

Because we find that the Bank's lien may trump the IRS's, we **REVERSE** the district court's grant of summary judgment in favor of the IRS. The case is **REMANDED** to the district court for proceedings consistent with this opinion.

6. The parties nonetheless attempt to construct arguments from this sparse factual record. The IRS says that there is no evidence that Dionne's contract with the Hospital was in the ordinary course of her business. *See* Appellee's Br. at 19. The Bank says there is no evidence that the contract was "outside the scope of Dionne's ordinary trade or business...." Appellant's Reply Br. at 7. Again, on this record it is impossible to evaluate these contentions; as the parties say, there is simply insufficient evidence.

These arguments foreshadow the ultimate question in a trade-or-business determination: what constitutes ordinariness? The IRS is arguing, in essence, that the Dionne–Hospital contract, because it resulted in the transfer of Dionne's Greenlawn license, cannot be considered ordinary. The Bank appears to have conceded as much; in its original complaint against the Hospital in Massachusetts state court, it claimed that the "transfer of the license was not in the ordinary course of Shirley Dionne's business." *See* App. at 24, ¶ 21. The state court, however, determined that the contract was for personal services, rather than for the sale or transfer of the Greenlawn license. The Bank echoes this characterization—the Dionne–Hospital contract as a personal services contract—and appears to focus its brief arguments on the normality of such contracts in Dionne's business. (And, in response to the IRS's argument, if the $75,000 represented proceeds of a sale or transfer of the license, there is no question that the Bank would have held a prior secured interest, entitling it to the money without having to navigate § 6323(c)'s maze of definitions.). Prudence compels us to allow the district court to weigh these fact-specific considerations in the first instance.