**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AMERICAN INVESTMENT
FINANCIAL, A Utah Industrial Loan
corporation,

      Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

      Defendant-Appellee.

Case No. 05-4217
(D.C. No. 2:03-CV-844-PGC)
(D. Utah)

---

**ORDER**
Filed February 2, 2007

---

Before **HENRY**, and **MURPHY**, Circuit Judges, and **FIGA,**[*] District Judge.

---

      Appellee's motion to publish the decision entered on December 14, 2006, is

granted. The Clerk is directed to reissue the Order & Judgment as a published decision.

The published opinion is attached to this order.

                    Entered for the Court
                    Elisabeth A. Shumaker, Clerk

                    By:
                        Deputy Clerk

---

    [*] The Honorable Phillip S. Figa, United States District Judge for the District of Colorado, sitting by designation.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**December 14, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

AMERICAN INVESTMENT
FINANCIAL, A Utah Industrial Loan
corporation,

     Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

     Defendant-Appellee.

Case No. 05-4217

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:03-CV-844-PGC)**

---

Before **HENRY**, and **MURPHY**, Circuit Judges, and **FIGA**,[**] District Judge.

---

**FIGA**, District Judge.

---

American Investment Financial ("AIF") appeals from the district court's ruling

granting the United States partial summary judgment in a lien priority dispute. In

competing motions for summary judgment, AIF and the United States each claimed

---

[**] The Honorable Phillip S. Figa, United States District Judge for the District of
Colorado, sitting by designation.

priority to cash collected for medical services provided after June 28, 2002. The district court rejected AIF's claims and granted partial summary judgment to the government. We affirm.

## I. BACKGROUND

Nightime Pediatrics Clinics, Inc. ("Nightime"), a Utah corporation also doing business as Nightime Urgent Care, provided after-hours medical care to patients. AIF, a Utah industrial loan corporation, loaned Nightime $803,000 in 2000, to be secured by all of Nightime's existing and after-acquired accounts, inventory and general intangibles. The loan terms required Nightime to make monthly payments, but it defaulted on its obligation on November 6, 2002. AIF then demanded that Nightime cure its default, and later filed a complaint in Utah state court. A default judgment was entered against Nightime on January 20, 2004, in the amount of $621,766.77 plus interest and attorney's fees.

Nightime also defaulted on tax obligations to the federal government, beginning in 1999. The IRS filed the first of four tax liens on May 14, 2002. As of October 11, 2003, Nightime owed $599,739.41 to the IRS.

Nightime ceased operations on August 31, 2003. At that time, its assets included inventory, accounts receivable and general intangibles. The accounts receivable consisted of amounts owned to Nightime from healthcare insurance companies. Some of these insurance payments were made pursuant to contracts between Nightime and various insurance companies ("Provider Contracts"), which were entered into before the filing of

2

the first federal tax lien. Each of the Provider Contracts included, among other things, provisions for compensation to Nightime according to a set payment schedule for covered services rendered to insured patients. The Provider Contracts gave Nightime preferred-provider status, meaning that Nightime would receive a higher percentage of reimbursement from the insurance company than it would receive if no Provider Contract was in place.

After Nightime's liquidation, at least $315,863.37 remained in cash receipts from liquidation of accounts receivable, and $28,761.92 from the liquidation of its inventory. A large portion of the cash receipts from the liquidation of the accounts receivable consisted of payments made for services to patients after June 28, 2002, which is the end of the 45-day "safe harbor" period following the filing of the first notice of the federal tax lien under the relevant statutory provision. Some of these payments were from insurance companies for services provided to covered patients ("disputed cash"), and the remaining payments came from patients or entities that did not have a Provider Contract with Nightime.[1]

AIF commenced a wrongful levy action against the United States on September 23, 2003. AIF and the Government filed cross-motions for summary judgment, each claiming entitlement to the disputed cash that resulted from payments for services after June 28, 2002. The district court denied AIF's motion and granted the government's

---

[1]AIF made no claim to these remaining payments, unless they stemmed from services provided within the 45-day safe harbor period. Such payments are not at issue in this appeal.

3

motion, holding that the disputed cash did not constitute proceeds of contract rights and that the federal lien had priority. The court concluded that even if AIF's security interest extended to contract rights, the disputed cash was the proceeds of accounts receivable and belonged to the Government. This court heard oral argument following AIF's appeal.

## II. STANDARD OF REVIEW

The decision of a district court to grant or deny a motion for summary judgment is reviewed *de novo*. Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006). Summary judgment is appropriate if there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(c).

## III. DISCUSSION

The Federal Tax Lien Act ("FTLA") grants the United States a lien upon all property and rights to property, both real and personal, of a taxpayer who has failed to pay taxes after demand has been made. See 26 U.S.C. § 6321; Plymouth Sav. Bank v. I.R.S., 187 F.3d 203, 206 (1st Cir. 1999). The FTLA gives certain commercial liens priority over federal tax liens. See 26 U.S.C. § 6323. Congress enacted this legislation to help improve the status of private secured creditors, and modernize the "relationship of Federal tax liens to the interests of other creditors." United States v. Kimball Foods, Inc., 440 U.S. 715, 738 (1979) (quoting S. REP. NO. 1708 at 1-2 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 3722, and citing H.R. REP. NO. 1884 at 35 (1966)).

Section 6323(c) gives a commercial lien (*i.e.* a security interest) priority over a federal tax lien if certain conditions are met. First, the security interest must be in

4

qualified property. Second, this qualified property must be covered by the terms of a written agreement entered into before the federal tax lien filing. Third, this written agreement must constitute either a commercial transactions financing agreement ("CTFA"), which is at issue in the instant case, or one of two other specified agreements. Finally, the security interest must be protected under state law against a judgment arising out of an unsecured obligation.

A CTFA is an agreement entered into by a person in the course of trade or business, in order "to make loans to a taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business." 26 U.S.C § 6323(c)(2)(A)(i). The loan must be made prior to or within 45 days of the federal tax lien filing or before the lender had actual knowledge of the tax lien filing (if this is earlier than 45 days) in order to qualify under this subsection. See § 6323(c)(2)(A)(ii). "Commercial financing security" is defined as inventory, mortgages on real property, accounts receivable, and "paper of a kind ordinarily arising in commercial transactions," which includes contract rights. § 6323(c)(2)(C); 26 C.F.R. § 301.6323(c)-1(c). With respect to a CTFA, qualified property includes only commercial financing security (*e.g.* contract rights or accounts receivable) acquired by the taxpayer within 45 days of the federal tax lien filing. § 6323(c)(2)(B).

When analyzing a priority dispute under FTLA, courts first look to state law to determine the "nature of the legal interest which the taxpayer had in the property sought to be reached by the statute." Aquilino v. United States, 363 U.S. 509, 512-13 (1960)

5

(ellipsis and footnote omitted); United States v. Cache Valley Bank, 866 F.2d 1242, 1244 (10th Cir. 1989). Federal law creates no property rights, but does attach federally defined consequences to rights created under state law. See Aquilino, 363 U.S. at 513-14.

Once a court has determined that a property interest exists under state law, the relative priority of the liens is determined under federal law. See Cache Valley Bank, 866 F.2d at 1244. As noted above, for a private security interest to take priority over a federal tax lien, the interest must be in qualified property, meaning the property must be a type of commercial financing security acquired prior to, or within 45 days after, the federal tax lien filing. See 26 U.S.C. § 6323(c)(1) and (2).

Relevant Treasury regulations contain definitions to aid in determining whether property is "qualified" under the statute. These regulations define commercial financing security such as contract rights and accounts receivable, and outline when such property is acquired. A contract right is defined as "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." 26 C.F.R. § 301.6323(c)-1(c)(2)(i). An account receivable is "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." Id. § 301.6323(c)-1(c)(2)(ii). Contract rights are acquired when a contract is made, while an account receivable is acquired when a right to payment is earned by performance. Id. § 301.6323(c)-1(d). Identifiable proceeds arising from the collection or disposition of qualified property are considered to be acquired at the time qualified property is acquired. Id. Thus, proceeds of a contract right are considered to be acquired when the contract is

6

made, while the proceeds from accounts receivable are acquired when the service is performed.

One difficulty encountered by courts in determining whether property is an account receivable or a contract right is that often the property can arguably be classified as both. See Bremen Bank & Trust Co. v. United States, 131 F.3d 1259, 1264 (8th Cir. 1997). Cases dealing with § 6323 often involve some sort of contract, and in some cases the payments made pursuant to these contracts are considered the proceeds of contract rights. See Plymouth, 187 F.3d at 207; Pine Builders, Inc. v. United States, 413 F. Supp. 77, 84 (E.D. Va. 1976). However, money paid pursuant to a contract sometimes is classified solely as an account receivable. See Bremen Bank, 131 F.3d at 1266 (holding that "exclusive shipping" contract did not grant any right to payment prior to performance).

Here, the district court held that the disputed cash resulted from health care insurance receivables under the Utah Uniform Commercial Code. Such receivables are classified as accounts under Utah's applicable statute. See UTAH CODE ANN. § 70A-9a-102(2)(b). The court then determined that the disputed cash stemmed from accounts receivable under federal law. On appeal, AIF does not contest this classification under Utah state law. It argues instead that the district court incorrectly classified the disputed cash under the federal statute. Because qualified property is commercial financing security (*e.g.* accounts receivable or contract rights) acquired prior to 45 days of the federal tax lien filing, the district court held that AIF did not meet this requirement with

7

regard to the disputed cash. Rather, the cash was the proceeds of accounts receivable that stemmed from services provided after the statutory "safe harbor" had passed, and the federal government's lien was given priority. We agree and affirm the district court's decision.

It is undisputed that AIF perfected its security interest, that a written agreement was entered into prior to the tax lien filing, and that this agreement constituted a CTFA. Thus only one of the four elements required for a commercial security interest to prevail over a federal tax lien is at issue here: whether AIF had an interest in qualified property as defined within the federal statute.

AIF argues that the district court erred in holding that the disputed cash stemmed from accounts receivable, rather than contract rights, contending that the Provider Contracts did grant a right to payment prior to performance. AIF also analogizes the facts here to cases such as Plymouth and Pine Builders, in which the respective courts held that the disputed cash constituted the proceeds of contract rights.

AIF's argument that the disputed cash constituted the second-generation proceeds of contract rights fails in several ways. First of all, the Provider Contracts did not guarantee a definite right to payment prior to the performance of service. Rather, the contracts ensured a certain rate of reimbursement that the insurance company would pay to Nightime if certain conditions were met. Specifically, Nightime would receive payment if 1) a patient covered by an insurance company that had a provider contract with Nightime came to Nightime and received services; 2) such services were covered

8

both under the patient's contract and the Provider Contract with Nightime; 3) the patient requested that the insurance provider be billed; and 4) Nightime submitted bill to provider in a timely fashion. Nowhere did the Provider Contracts guarantee that Nightime would receive any payment pursuant to the contracts, for it was not certain that any qualifying patients would come to Nightime for services in a manner that would entitle Nightime to payment. And no capitation contracts were in place that would guarantee a certain level of payment regardless of whether any covered patients came into Nightime.

A crucial element of the Provider Contracts at issue here is that a right to payment hinged on the actions of third parties; in other words, a right to payment arose by Nightime's performance of services for patients. When a patient came to Nightime and received care, an account receivable was created. These accounts receivable were between the patient and Nightime, even with respect to patients who were covered by insurance companies that had Provider Contracts with Nightime. The only difference between covered and noncovered patients is that a portion of the payment due by covered patients presumably could come from the insurance company rather than the patients themselves.

Nightime had no enforceable payment rights under the Provider Contracts until a covered patient came into Nightime, created an account receivable and the insurance company was billed. While AIF argues that there was a contract right to payment because Nightime had the right to collect payments, this argument fails because it had no right to payment prior to performing services. Nightime also had a right to collect

9

copayments from patients, but AIF conceded at oral argument that there was no right to collect a copayment prior to a patient coming in to receive medical care.

AIF also argues that the Provider Contracts were executed prior to filing the tax lien, and thus guaranteed payment to Nightime well before the filing of the tax lien. Again, the third-party factor leads this argument to fail. The Provider Contracts do not list specific services that Nightime was required to complete at some point in the future, nor do the contracts specify payments that the insurance companies were required to make at some point. It is possible that Nightime would not be called upon to do anything and thus would not be entitled to any payment. Any right to payment, and likewise any responsibility to pay, hinged on a covered patient coming to Nightime; yet such a patient may never have walked through Nightime's doors.

AIF further contends it is immaterial that payment obligations under the Provider Contracts were enforceable only after the performance of services, and that there is always a risk in contracts that the performance contemplated under the contract will not occur. Although it is true in executory contracts there is a risk that the performance that is the subject of the contract will not occur, such circumstances would give rise to a claim for breach of contract. Under the Provider Contracts here, if performance never occurs (*i.e.* a patient never comes to Nightime and thus does not receive care), there would be no contract claim.

The district court illustrated this concept in its opinion, using as an example a contract between a builder and a homeowner. If the homeowner contracted with a builder

10

to construct a house and promised to pay $100,000 upon completion, the builder had an enforceable right to payment that arose at the time the contract was signed. If the builder refuses to build the home, the homeowner has a breach of contract claim. If the homeowner refuses to pay once the home is completed, the builder likewise has a claim for breach of contract. In contrast, under the Provider Contracts, neither party could bring an action to require performance until a third party under the right circumstances sought medical services from Nightime. Nightime could not bring a breach of contract claim against an insurance company until it provided medical services to a covered patient, and an insurance company could not bring a claim unless one of their insureds came to Nightime and was refused medical attention.

Furthermore, the caselaw on which AIF relies does not lend much support to its arguments. It cites cases involving contracts between a taxpayer and another party, where the taxpayer was to perform a specified service for that party in exchange for a specified payment. See Plymouth, 187 F.3d at 205-09; Pine Builders, 413 F. Supp. at 79-84. Plymouth, for example, involved a contract between a taxpayer and a hospital. The taxpayer was to help the hospital to obtain a license, and in return the hospital was to pay the taxpayer $300,000 in several installments. At the time the IRS filed a lien in that case, the taxpayer had not yet obtained the license for the hospital, and she did not procure the license within the 45-day safe harbor. See Plymouth, 187 F.3d at 206. However, she had been paid two installments, and was awaiting the final balance. The Plymouth court held that the taxpayer obtained a contract right to be paid for the work she

11

agreed to do, and that the money paid to her resulted from that contract right. Thus, because the contract had been entered into before the expiration of the safe harbor, the private security interest in that case prevailed over the federal tax lien.

In Pine Builders, a carpet company entered into contracts with two parties, requiring the company to install carpeting in 1,000 apartments. See Pine Builders, 413 F. Supp. at 79. The pricing in the contract was calculated per apartment. Id. The court rejected the argument that the contract was unilateral, or requiring acceptance by performance with no right to payment until performance. See id. at 83-84. Rather, the court determined that carpet company had acquired a right to the contract proceeds when the contract was made. See id. at 84. The contracts in Plymouth and Pine Builders are readily distinguishable from the Provider Contracts here, as those contracts established a set price to be paid for specified goods and services, and the right to payment was not dependent upon the actions of third parties.

AIF also cites a case involving a contract that does not include a specified payment amount. See In re Dorrough, Parks & Co., 185 B.R. 46, 47-49 (E.D. Tenn. 1995). In that case, the taxpayer—an accounting firm—had an employment contract with a customer. While the contract did not specify an hourly or monthly rate, it did provide a monthly cap and a provision for a reasonable fee. The court noted evidence that such transactional work contracts typically do not contain a final price, and held that this contract did not fail for lack of price term. See id. at 49. Thus, because the contract had been entered into prior to the filing of the tax lien by the IRS, the private security interest took priority.

12

However, the contract in Dorrough, Parks & Co. is also distinguishable from the AIF Provider Contracts. The Dorrough, Parks & Co. contract was between the taxpayer and another party for certain services that would be provided for that party in exchange for payment. While the payment amount was not specified, a range was given, the contract contemplated the "customary practice" of determining fees and rates, and payment pursuant to the contract did not depend in any way upon the actions of third parties. Such factors differ from those in the case at bar, where third party action is required and no relevant custom has been presented.

The government, on the other hand, makes a compelling analogy to Bremen Bank, in which the Eighth Circuit held that an exclusive-shipping contract did not generate a choate right to payment, because there was no right to ship a specific amount of goods under the contract. See 131 F.3d at 1266. This meant that payments made pursuant to this contract past the 45-day "safe-harbor" were not superior to the federal tax lien because they were not considered to have been acquired at the time the contract was made. In reaching this conclusion, the court examined the "circumstances under which a debtor has a 'right to payment under a contract not yet earned by performance,' within the meaning of the [Treasury] regulation." Id. The court looked to Missouri state law to determine if the taxpayer had a right to payment under the contract, and if so whether those rights were "sufficiently choate to be recognized under the federal tax code." Id. The court held that, while the contract gave rise to certain rights, there was no choate right to payment because the taxpayer could not require its customer to ship a "specific

13

amount of goods."

As in Bremen Bank, the Provider Contracts here gave rise to some rights, but a choate right to payment prior to performance was not among them. Under Utah law, "a contract can be enforced by the courts only if the obligations of the parties are set forth with sufficient definiteness that it can be performed." Brown's Shoe Fit Co. v. Olch, 955 P.2d 357, 363 (Utah Ct. App. 1998). The Provider Contracts guaranteed that Nightime would receive a certain payment for services to covered patients if all required conditions were met. These contracts required among other things that a third party utilize Nightime's services in order for Nightime to have a right to payment. It could claim no enforceable right to payment prior to such third party action. Nightime's right to payment arose when it performed services, not when it entered the Provider Contracts.

## IV. CONCLUSION

Nightime had no right to payment prior to performance under the Provider Contracts. Rather, a right to payment arose only when identifiable care was rendered to a patient, and a specific account receivable was thus created. Under the FTLA, the disputed cash is properly classified as the proceeds of accounts receivable, not contract rights. As a result, the government's tax lien takes priority over's AIF's security interest, as the district court correctly determined.

AFFIRMED.

14